**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**BRUCE WASHINGTON**                                      **CIVIL ACTION**

**VERSUS**                                                          **NO. 24-00145**

**RANDY SMITH, ET AL.**                                   **SECTION "O"**

<u>**ORDER AND REASONS**</u>

Before the Court in this civil rights case is a motion[1] to dismiss pursuant to Rule 12(b)(6) by Defendants Justin Parker, Michael Sevante, Jeffrey Boehm, Jeanine Buckner, Jeremy Church, Chance Cloud, George Cox, Curtis Finn, Frank J Francois Jr., Dale Galloway, Taylor Lewis, Denise Mancuso, Michael Ripoll Jr., Douglas Searle, and Randy Smith.[2] Defendants are all employees of the St. Tammany Parish Sheriff's Office ("STPSO"). Plaintiff Bruce Washington opposes[3] the motion and Defendants replied in further support thereof.[4] For the following reasons, the motion is **GRANTED IN PART AND DENIED IN PART**.

## I.    BACKGROUND

This civil rights litigation arises from two traffic stops and the events that followed. Because Defendants move to dismiss Washington's second amended complaint (the operative "complaint") pursuant to Rule 12(b)(6), the Court considers

---

[1] ECF No. 104.
[2] Randy Smith recently retired as Sheriff. His successor "is automatically substituted as a party" and "[l]ater proceedings should be in the substituted party's name[.]" FED. R. CIV. P. 25(d). The Court invites counsel for Defendants to file a motion to substitute interim sheriff Bret Ibert. Meanwhile, "any misnomer . . . must be disregarded." *See id.*
[3] ECF No. 118.
[4] ECF No. 121.

the following well-pleaded facts drawn from Washington's second amended complaint. *See generally Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 190 (5th Cir. 2009).[5]

Plaintiff Bruce Washington, a Black resident of St. Tammany Parish, filed the instant suit after he was pulled over by St. Tammany Parish Sheriff's Office ("STPSO") Police Officers on two occasions.[6] Washington alleges that his interactions with the STPSO Officers were racially motivated. Washington's allegations are described in further detail below.

### A. January 13, 2023 Traffic Stop

At approximately 7:16 p.m. on January 13, 2023, Washington—who was driving on Highway 12, heading to New Orleans to spend Martin Luther King Jr. weekend with his girlfriend and perform yardwork for her—was pulled over by an unmarked vehicle driven by STPSO Officers Chance Cloud and Taylor Lewis, both Defendants in this case.[7] STPSO Officer Curtis Finn, also a Defendant, joined the

---

[5] In the second amended complaint, Washington alleges that "all references to timing of events or quotations of conversations between [the officers] and Mr. Washington are based on the body-worn camera footage obtained from the STPSO via a Public Records Request." ECF No. 96 at 17 n.21. Accordingly, as permitted, the Court has viewed the video evidence attached to Defendants' motion to dismiss because video of Plaintiff's January 13, 2023 traffic stop is "referenced in the complaint and . . . central to the plaintiff's claims." *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). The Court discounts the complaint allegations in favor of the video evidence *only* when that evidence "blatantly contradict[s]" the plaintiffs' well-pleaded factual allegations. *Harmon v. City of Arlington, Texas*, 16 F.4th 1159, 1163 (5th Cir. 2021) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (observing, in reviewing district court's ruling on motion to dismiss, that the plaintiffs "referenced the video in their complaint and brief, . . . and caselaw supports our consideration of the video").

[6] *See generally* ECF No. 96. Less than two years prior to the traffic stops forming the basis of the instant lawsuit, Washington had been stopped by STPSO deputies; a traffic stop which gave rise to prior litigation. *See Washington v. Smith*, 639 F. Supp. 3d 625 (E.D. La. 2022).

[7] ECF No. 96 ¶¶ 3, 54-57.

2

traffic stop shortly after it began.[8]  Upon pulling Washington over, Cloud informed Washington that the stop was because Washington had failed to use his turn signal to change lanes.[9]  Washington "immediately" apologized to the officers; Cloud assured him that he was "good."[10]  Cloud then asked for Washington's identification, which Washington produced, and Cloud began to question him, asking, for example, if he had "any weapons or anything in the boot?"[11]

While Cloud was questioning him, Lewis used a flashlight to look into his backseat and then requested that Cloud instruct Washington to exit his vehicle; Cloud said to Washington, "Do me a favor, man. Hop on out for me real quick?"[12] Before Washington exited the vehicle, Lewis retracted his previous statement to Cloud about Washington exiting his car by informing Cloud that the item in the backseat was "not what [he] thought it was."[13]  Despite hearing Lewis, Cloud continued to wait for Washington to exit the vehicle, which Washington did without external protest.[14]

Cloud then again asked Washington if he had any weapons on his person or "anything crazy [he] should know about"; Washington said no.[15]  Cloud told Washington that he would like to perform a pat down search.[16]  Washington raised

---

[8] *Id.*
[9] *Id.* ¶ 58.
[10] *Id.* ¶¶ 59-60.
[11] *Id.* ¶¶ 61-62
[12] *Id.* ¶¶ 63, 65.
[13] *Id.* ¶ 66.
[14] *Id.* ¶¶ 67, 71.
[15] *Id.* ¶ 72.
[16] *Id.* ¶ 73.

his hands in a "gesture of submission" but did not verbally respond.[17]  Washington states that he was fearful for his life and believed that he would be patted down regardless of whether he consented.[18]  To conduct the frisk, Cloud ordered Washington to the rear of his vehicle and directed Washington to put his hands on top of the trunk; Washington complied.[19]  During the frisk, Cloud reached into Washington's pocket and removed Washington's wallet;[20] Cloud reached into an additional pocket of Washington's but did not find anything.[21]

Cloud then handed Washington's identification to Lewis to run a license and records check.[22]  To Washington, Cloud stated "your wallet there—do you mind if I make sure you don't [have] anything crazy in there?"[23]  Washington gave his wallet to Cloud, but states that he did so only because he felt he had "no choice."[24]  Cloud then went through Washington's wallet.[25]

Finn joined the group as Cloud was searching Washington's person and wallet.[26] Upon joining, Finn began questioning Washington about where he was from and where he was going.[27]  While questioning Washington, Finn used his flashlight to look into Washington's car.[28]  Washington told Finn that his "weed-eater" was in

---

[17] *Id.* ¶¶ 74, 78.
[18] *Id.* ¶¶ 75-80.
[19] *Id.* ¶¶ 79-81.
[20] *Id.* ¶ 83.
[21] *Id.* ¶ 85.
[22] *Id.* ¶ 87.
[23] *Id.* ¶ 94.
[24] *Id.* ¶¶ 95, 97.
[25] *Id.* ¶ 97.
[26] *Id.* ¶ 99.
[27] *Id.* ¶¶ 99-110.
[28] *Id.* ¶ 110.

the backseat of the car and Finn confirmed that he saw what the item was.[29]  During this questioning, Lewis, who was in the STPSO vehicle, remained in possession of Washington's identification.[30]

Cloud then asked Washington whether there was anything in his car that the officers "should be concerned about."[31]  Washington responded by stating "No, you can look" and gestured towards the windows that Finn and Lewis had previously looked into.[32]  Washington also offered to open the door so that the officers could view the weed-eater in the backseat.[33]  Cloud declined Washington's offer to open the door, radioed that no further assistance was necessary, and then informed Washington that he (Cloud) was "not a ticket writer" and wouldn't write him a ticket for the allegedly un-signaled lane change.[34]  Washington alleges that, if not sooner, this is the point at which the purpose of the stop had concluded.[35]

Finn then re-approached Washington and looked into Washington's vehicle without his flashlight.[36]  Washington offered to open his trunk for the officers to take a look, but Washington maintains that he did *not* inform the officers that they could search his car.[37]  Cloud "did *not* ask if the Defendants could search [his] car[;]" rather, he then informed Washington that the officers would "go through [his] car real

---

[29] *Id.* ¶¶ 113-15.
[30] *Id.* ¶ 117.
[31] *Id.* ¶ 119.
[32] *Id.* ¶ 121.
[33] *Id.* ¶ 122.
[34] *Id.* ¶¶ 123-25.
[35] *Id.* ¶ 125.
[36] *Id.* ¶ 127.
[37] *Id.* ¶¶ 128-132.

quick."[38]  Finn began questioning him before attempting to open his passenger side door.[39]  Washington asked Finn if he (Washington) should unlock the door; Finn responded that he would do it himself.[40]

At 7:20 p.m.,[41] Lewis returned after completing checks of Washington's license and receiving confirmation that no outstanding warrants for Washington existed.[42] Lewis did not immediately return Washington's license; instead he maintained possession of it as Finn began searching Washington's car.[43]  While Finn was searching the car, Cloud continued questioning Washington before asking Lewis to take over that role.[44]  At that point Cloud moved to the now-unlocked passenger door and joined Finn in searching the vehicle.[45]  Throughout the search of the car, at least one officer was engaged in questioning Washington or engaging in small talk with him while the others performed the search.[46]  Washington states that, in an effort to avoid appearing disrespectful or uncooperative, he did not refuse the search or refuse to answer the officers' questions.[47]

The officers thoroughly inspected his vehicle, looking not only near the weed-eater that had been the subject of early conversation but throughout the cabin, under

---

[38] *Id.* ¶¶ 135-36 (emphasis in original).

[39] *Id.* ¶¶ 138-42.

[40] *Id.* ¶¶ 143-45.

[41] The Second Amended Complaint alleges he returns at 7:19; Lewis's body camera video timestamp shows the time as 7:20.

[42] *Id.* ¶ 147.

[43] *Id.* ¶ 148.

[44] *Id.* ¶ 149.

[45] *Id.* ¶ 152.

[46] *Id.* ¶ 153.

[47] *Id.* ¶ 151.

the hood, and inside the trunk of the vehicle.[48]   The officers looked through the contents of items within the vehicle, including a briefcase, backpack, and bags.[49] During the search, Cloud began "muttering" about what Lewis had seen.[50] Washington alleges that this was essentially an admission that Cloud did not know what he was looking through Washington's vehicle for.[51]   Cloud then moved to the rear of the vehicle to search the trunk.[52]   Cloud did not ask for Washington's consent before opening and inspecting the trunk.[53]

Throughout the search of his vehicle, the officers "peppered" Washington with questions, including questions unrelated to the stop.[54]   Washington states that this questioning prevented him from observing or limiting the search.[55]

Around 7:29, approximately 10 minutes after the license and identification checks came back clear and 13 minutes after Washington argues any chance of reasonable suspicion was "dispelled," Washington was finally informed that he could leave.[56]   Only at this point did Lewis return Washington's identification.[57]

**B.  Report Following the January Traffic Stop**

Days after the January traffic stop, Washington contacted STPSO Internal Affairs which he alleges is comprised of two individuals: Captain Dale Galloway and

---

[48] *Id.* ¶¶ 155-203.
[49] *Id.* ¶¶ 169, 173, 180.
[50] *Id.* ¶ 181.
[51] *Id.*
[52] *Id.* ¶¶ 182-84.
[53] *Id.* ¶ 184.
[54] *Id.* ¶ 213.
[55] *Id.*
[56] *Id.* ¶¶ 203-07.
[57] *Id.* ¶ 206.

Sergeant Frank Francois, Jr.[58]  Washington spoke to Galloway and Francois for around 30 minutes on January 26, 2023.[59]  Washington sat for a complaint intake interview on January 30, 2023, which lasted for approximately 30 minutes.[60] Francois and Galloway then spoke to Cloud, Lewis and Finn on January 31, 2023.[61]

On February 1, 2023, the STPSO Public Integrity Bureau reported its findings on the incident.[62]  The Investigations & Professional Standards Division, Public Integrity Bureau and Internal Affairs Division found that the actions of Cloud, Lewis, and Finn during the January traffic stop were within the parameters of the STPSO's policies and regulations, and that Washington's complaint regarding the traffic stop lacked merit.[63]

Washington alleges that Galloway and Francois report directly to Investigations Major Michael Ripoll, Jr.[64]  He further alleges that the Investigations Major is responsible for assuring compliance with policies.[65]  Washington additionally alleges that Sheriff Randy Smith delegated policymaking authority to Galloway and Francois.[66]

### C. October 8, 2023 Traffic Stop

On October 8, 2023, STPSO Deputy Douglas Searle pulled Washington over. Searle followed Washington for nearly 20 miles along Highway 21 before pulling him

---

[58] *Id.* ¶ 218.
[59] *Id.* ¶ 221.
[60] *Id.* ¶ 222.
[61] *Id.*
[62] *Id.* ¶ 223.
[63] *Id.* ¶ 224.
[64] *Id.* ¶ 219.
[65] *Id.*
[66] *Id.* ¶ 220.

over just shy of the Washington Parish line.[67]  At the time of the stop, Searle informed

Washington that the reason for the stop was that Washington did not have insurance,

a statement that was untrue.[68]  However, when Searle was later asked about the stop

by STPSO Internal Affairs, he provided that the stop was because Washington's tag

lights were too dim to read the license plate.[69]

Searle questioned Washington for around 10 minutes, during which Searle did

not activate his body camera.[70]  As he questioned Washington, Searle peered into

Washington's vehicle.[71]  Upon returning to Searle's own vehicle with Washington's

license, Searle finally activated his body camera.[72]  Searle then took photographs of

Washington's driver's license and other documentation with a cellphone.[73]

Washington states that Searle's body camera footage shows that the camera roll of

Searle's phone includes pictures of other individuals' identifications.[74]

**D. Report Following the October Traffic Stop**

Following the October traffic stop, Washington sought to file a complaint with

the STPSO.  Consistent with this goal, Washington left two voicemails on November

21, 2023 and November 27, 2023.[75]  Washington spoke to Francois on November 30,

2023 and set up an interview for December 5, 2023.[76]  But Washington was not able

---

[67] *Id.* ¶¶ 22, 245.

[68] *Id.* ¶¶ 23, 24, 247.

[69] *Id.* ¶ 23.

[70] *Id.* ¶ 250.

[71] *Id.*

[72] *Id.* The Court is not in receipt of this footage and has therefore not reviewed it.

[73] *Id.* ¶¶ 251-55.  Washington alleges that, upon information and belief, the cellphone was Searle's personal cellphone because it had social media applications on it.  *Id.* ¶ 252.

[74] *Id.* ¶251-55.

[75] *Id.* ¶ 257.

[76] *Id.* ¶¶ 257-58.

to sit for the interview on December 5, 2023 because nobody was at the Public Integrity Board when he arrived.[77]   Further, despite Washington's attempts to contact Francois, Washington was unable to reach Francois.[78] Washington was later informed by an STPSO employee that Francois had left early on the day of Washington's scheduled interview to be with family.[79]   This statement was then contradicted by Galloway, who called Washington later that afternoon to inform him that Francois was called on another assignment.[80]   A new interview time was scheduled for the afternoon of December 7, 2023.[81]

After providing the December 7 interview date and time, Galloway texted Washington that he should come to the interview alone.[82]   Despite this instruction, Washington arrived for the interview on December 7 with his attorney.[83]  Francois and Galloway came to the parking lot as Washington parked and "inspected Mr. Washington's vehicle."[84]  Francois and Galloway provided no response when asked if there was something wrong with Washington's car.[85]

Francois informed Washington that Washington's attorney could not be present when Washington made his complaint.[86]  The officers provided no reason for this limitation, and Francois would not budge.[87]  Washington states that he did not

---

[77] *Id.* ¶ 258.
[78] *Id.*
[79] *Id.* ¶¶ 259-60.
[80] *Id.*
[81] *Id.* ¶ 260.
[82] *Id.* ¶ 261.
[83] *Id.* ¶ 262.
[84] *Id.* ¶ 263.
[85] *Id.*
[86] *Id.* ¶ 264.
[87] *Id.*

want to sit for the interview without counsel, so he instead prepared a statement with counsel while still in the parking lot.[88]   The statement was then printed and Washington signed it.[89]   Internal Affairs did not interview Washington, and Washington was not contacted regarding the complaint after the December 7 parking lot meeting.[90]

Francois and Galloway interviewed Searle for thirteen minutes on December 12, 2023.[91]  It was during this interview that Searle provided the new rationale—that the license plate was not properly illuminated—for stopping Washington.[92]  Searle reported that the reason his body camera was not on for most of the stop was that he simply "forgot."[93]

Francois and Galloway did not investigate Washington's concerns of Searle's use of a cellphone to photograph Washington's license during the stop.[94]  Additionally, Francois and Galloway did not investigate what Searle did with that photograph, or the other photographs of identification that appeared on the cellphone camera roll.[95]

Francois and Galloway's investigation found Washington's complaint to be without merit, and that the only violation of STPSO policy found was the failure to turn on the body camera after initiating the stop.[96]

---

[88] *Id.* ¶¶ 265-66.
[89] *Id.* ¶ 266.
[90] *Id.* ¶ 267.
[91] *Id.* ¶ 268.
[92] *Id.* ¶ 269.
[93] *Id.* ¶ 271.
[94] *Id.* ¶ 272.
[95] *Id.*
[96] *Id.* ¶ 273.

11

### E.  Requests for Information

Washington states that he encountered difficulties requesting record information from the STPSO.[97]  He specifically alleges the following:  On November 9, 2023, through his counsel, Washington requested traffic stop records with demographics information for January 2023.[98]  Seven days later, on November 16, 2023, he was provided a list of all traffic stops for the period, but the list did not contain the demographics information.[99]  This is despite Washington requesting information including "race, sex, and age" of stopped individuals.[100]  On November 17, 2023, Denise Mancuso, the custodian who provided the report the day prior, agreed to produce a new report utilizing the demographic filters.[101]  After re-running the search, Mancuso reported to Washington's attorney that the new report contained more results than the original but that she could not release the additional reports before conferring with Information Services.[102]  On November 28, 2023 a new report was issued to Washington but it did not contain the demographic information.[103]

Washington then requested traffic stop records for a period in November 2023.[104]  He received multiple reports from the Custodian Defendants with demographic information included.[105]  After receiving these reports, Washington

---

[97] *See generally id.* ¶¶ 280-304.

[98] *Id.* ¶ 280.

[99] *Id.*

[100] *Id.*

[101] *Id.* ¶ 281.

[102] *Id.*

[103] *Id.* ¶ 282.

[104] *Id.* ¶ 283.

[105] *Id.* ¶ 284. Plaintiff's Second Amended Complaint defines the "Custodian Defendants" as Mancuso, Buckner, Sevante, and STPSO Records Custodian(s) John Doe(s).

requested the same information for the period of January 1, 2021 to December 31, 2022.[106]  He made this request on December 13, 2023.[107]  Washington followed up on this request on December 21, 2023, and received a response from Mancuso the next day.[108]  Mancuso informed Washington's attorney that a partial production was available but did not produce an invoice for the production until five days later and after multiple requests from Washington's counsel.[109]  The Custodian Defendants informed Washington that the requested demographic information would not be provided.[110]

On January 10, 2024, Washington's attorney submitted a public records request for reproduction of the electronically stored information regarding STPSO's traffic stops and information regarding the reporting system itself.[111]  Washington's attorney followed up with Custodian Defendants two weeks later.[112]  The initial and follow-up were not answered until January 30, 2024.[113]  Moreover, the response Washington/his attorney received was unsatisfactory as Custodian Defendants refused to produce certain information requested.[114]

### F. Allegations of Racism

Washington alleges that the STPSO has been aware that a disproportionate number of Black community members have been stopped by STPSO officers since at

---

[106] *Id.* ¶ 287.
[107] *Id.*
[108] *Id.* ¶¶ 289-90.
[109] *Id.* ¶¶ 290-94.
[110] *Id.* ¶¶ 294-96.
[111] *Id.* ¶¶ 300-01.
[112] *Id.* ¶ 302.
[113] *Id.* ¶¶ 303-04.
[114] *Id.* ¶ 303.

least 2008.[115] He further alleges that despite STPSO's refusal to provide certain data responsive to his public records requests, he was able to obtain a limited set of data, which underlies the statistics that follow: First, that the rate of traffic stops in St. Tammany Parish from January 1, 2023 to November 29, 2023 was 5,245 for every one hundred thousand Black residents and 1,619 for every one hundred thousand White residents; second, that people of color (*i.e.*, people not categorized as "white" in the dataset) are stopped at a rate at least 2.1 times higher than white people; third, that Black people accounted for 36% of people stopped for and 26% of people cited for traffic violations despite accounting for only 15% of the St. Tammany Parish populations; fourth, Black people were two times more likely than white people to receive a citation solely for a violation that could not be observable to an officer on patrol (*e.g.*, driving without a license); and fifth, Black people received 1.37 violations per traffic ticket compared with the 1.19 violations per traffic ticket received by white people, while Hispanic people received 1.86 violations per traffic ticket.[116]

**G. Claims**

Beginning with the January Traffic Stop, Washington brings a litany of state and federal law claims against the officers directly involved (Cloud, Lewis, and Finn). Specifically, Washington brings claims for: (1) unlawful extension of detention (First Cause of Action), (2) unlawful search and seizure (Second Cause of Action), and (3) unlawful search (Third Cause of Action), all in violation of the Fourth and Fourteenth Amendments of the United States Constitution and Article 1 Section 5 of the

---

[115] *Id.* ¶ 227.
[116] *Id.* ¶¶ 227-33.

Louisiana Constitution; (4) conspiracy to commit § 1983 violation (Eleventh Cause of Action); (5) unlawful search and seizure in violation of Article I Section 5 of the Louisiana Constitution (Twelfth Cause of Action); (6) invasion of privacy in violation of Article I Section 5 of the Louisiana Constitution (Thirteenth Cause of Action); (7) negligent infliction of emotional distress (Fourteenth Cause of Action); (8) failure to intervene (Eighteenth Cause of Action); and (9) false imprisonment (Nineteenth Cause of Action).

Moving to the October Traffic Stop, Washington brings two claims against Officer Searle: one § 1983 claim for unreasonable seizure in violation of the Fourth and Fourteenth Amendment of the United States Constitution and Article 1 Section 5 of the Louisiana Constitution against Searle (Fourth Cause of Action); and a state law claim for negligent infliction of emotional distress (Fifteenth Cause of Action).

In relation to the Investigation of the October Traffic Stop, Washington brings a claim for negligent infliction of emotional distress against defendants Francois, Galloway, Boehm (STPSO Deputy Chief), Ripoll, and Cox (STPSO Deputy Chief of Investigations & Professional Standards) (Sixteenth Cause of Action).

Washington additionally brings multiple claims alleging *Monell* liability for: unlawful searches in violation of the Fourth Amendment based on ratification against Smith, Boehm, Cox, Ripoll, Galloway, and Francois (Fifth Cause of Action); unlawful searches in violation of the Fourth Amendment based on a de facto policy against Smith and the "Supervisor Defendants"[117] (Sixth Cause of Action); unlawful searches

---

[117] Plaintiff's Second Amended Complaint defines the "Supervisor Defendants" as Boehm, Cox, Ripoll, Galloway, Francois, Parker, and Church.

in violation of the Fourth Amendment based on failure to train against Smith and the "Supervisor Defendants" (Seventh Cause of Action); unlawful searches in violation of the Fourth Amendment based on single decision by a final policymaker against Smith and the "Supervisor Defendants" (Eighth Cause of Action); racist policing practices in violation of the Fourteenth Amendment against Smith and the "Supervisor Defendants" (Tenth Cause of Action); and First and Fourteenth Amendment[118] violations against Smith and the "Custodian Defendants" in their individual and official capacities (Twenty-First Cause of Action).

Washington additionally brings a Title VI claim against Smith and the "Supervisor Defendants" (Ninth Cause of Action), a claim for negligent supervision/training against Smith and the "Supervisor Defendants" (Seventeenth Cause of Action), a claim for vicarious liability against Smith and the "Supervisor Defendants" (Twentieth Cause of Action), and a claim for failure to respond to public records requests under the Louisiana Public Records Act against Smith and the "Custodian Defendants" (Twenty-Second Cause of Action).

Defendants now move to dismiss each of Washington's 22 claims for failure to state a claim.[119]  Defendants additionally invoke qualified immunity.[120]

---

[118] Plaintiff's Second Amended Complaint appears to contain a mistake in the subtitling of this claim, stating that it is brought under the "First and Fourth Amendments" as the allegations in the text of the complaint discuss the First and Fourteenth, not First and Fourth Amendments.  *See* ECF No. 96 at 117-121.

[119] ECF No. 104.

[120] *Id.*

16

## II.    LAW AND ANALYSIS

Rule 8(a)(2) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A complaint that does not meet Rule 8(a)(2)'s pleading standard should be dismissed for failing to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell. Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitations of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

Ultimately, "[t]o survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Although courts "accept all well-pled facts as true, construing all reasonable inferences in the complaint in the light most favorable to the plaintiff, conclusory allegations, unwarranted factual inferences, or legal conclusions are not accepted as true." *Allen v. Hays*, 65 F.4th 736, 743 (5th Cir. 2023) (cleaned up).

17

In resolving a motion to dismiss, the Court is generally "limited to the contents of the pleadings, including any attachments thereto." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000) (citation omitted). However, there are two limited exceptions to this general rule in which the Court may rely on evidence beyond the complaint without converting a Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *George v. SI Grp., Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2014)). First, the Court "may consider 'any documents attached to the motion to dismiss that are central to the claim and referenced [or incorporated] in the complaint.'" *See PHI Grp., Inc. v. Zurich Am. Ins. Co.*, 58 F.4th 838, 841 (5th Cir. 2023) (quoting *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010)); *see also Doe v. Ferguson*, 128 F.4th 727, 733-34 (5th Cir. 2025) (citation omitted); *see also Edmiston v. Borrego*, 75 F.4th 551, 557-58 (5th Cir. 2023) (citations omitted). Second, the Court may consider "a matter subject to judicial notice under Federal Rule of Evidence 201." *George*, 36 F.4th at 619.

If the Court considers materials outside the pleadings, the motion to dismiss must be converted into a motion for summary judgment. *See* FED. R. CIV. P. 12(d); *see also Kennedy v. Chase Manhattan Bank USA*, 369 F.3d 833, 839 (5th Cir. 2004). If conversion to summary judgment is appropriate, the Court must notify the parties, then consider all evidence presented. *See* FED. R. CIV. P. 12(d); *see also Scanlan v. Texas A&M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003).

18

### A. Section 1983 and Qualified Immunity

Section 1983 "allows plaintiffs to seek damages from persons who violate their constitutional rights while acting under color of state law." *Gray v. White*, 18 F.4th 463, 467 (5th Cir. 2021). To state a claim under Section 1983, a plaintiff must (1) allege a violation of the Constitution or of federal law, and (2) demonstrate that the alleged violation was committed by a person acting under color of state law. *Doe on Behalf of Doe v. Dallas Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998). A state official whose "conduct deprives another of a right secured by federal constitutional or statutory law is nonetheless shielded from personal liability for damages under section 1983 by the doctrine of qualified immunity," unless "all reasonable officials" would have realized at the time that "it was proscribed by the federal law on which the suit is founded." *Dudley v. Angel*, 209 F.3d 460, 462 (5th Cir. 2000) (cleaned up).

Plaintiff argues in opposition to the motion to dismiss that qualified immunity does not apply to the allegations in the complaint and that the text of § 1983 precludes the defense of qualified immunity.[121] Later sections of this opinion address whether qualified immunity protects these officers from Plaintiff's specific claims. At the outset, though, the Court addresses Plaintiff's broader argument. This Court cannot overrule the Supreme Court and Fifth Circuit's qualified immunity doctrine. The Fifth Circuit recently considered the argument advanced by plaintiff and stated that "[w]hatever its merit, the argument is foreclosed because 'only the Supreme Court can definitively grapple with § 1983's enacted text and decide whether it means what

---

[121] ECF No. 118 at 72-77.

it says—and what, if anything that means for § 1983 jurisprudence.'" *Hankins v. Wheeler*, 109 F.4th 839, 845 (5th Cir. 2024) (quoting *Rogers v. Jarrett*, 63 F.4th 971, 981 (5th Cir. 2023) (Willett, J., concurring)).  This Court too cannot "grapple with § 1983's enacted text" and decide what it "means for §1983 immunity jurisprudence." *Id.*  Accordingly, this Court must reject Plaintiff's argument that qualified immunity is not authorized under the text of § 1983.

The doctrine of qualified immunity "provides government officials with immunity from suit 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Smith v. Lee*, 73 F.4th 376, 381 (5th Cir. 2023) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  The Supreme Court has stated that the doctrine "attempt[s] to balance competing values: not only the importance of a damages remedy to protect the rights of citizens, but also the need to protect officials who are required to exercise discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow v. Fitzgerald*, 457 U.S. 800, 800 (1982).  Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Hughes v. Garcia*, 100 F.4th 611, 618 (5th Cir. 2024) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Once a government official asserts the defense of qualified immunity, the burden shifts to the plaintiff to negate the defense. *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009).  Where, as here, a "motion to dismiss raises the defense of qualified immunity, the plaintiff must plead specific facts that both allow the court

20

to draw the reasonable inference that the defendant is liable for the harm . . . alleged and that defeat a qualified immunity defense with equal specificity." *Sanchez v. Nunemaker*, 179 F.4th 315, 318 (5th Cir. 2026) (citing *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017) (alteration in original) (quotation omitted)).  Thus, to overcome qualified immunity at the pleadings stage, "the plaintiff must 'have alleged facts sufficient to plausibly show that (1) the defendant's conduct violated a constitutional right and (2) the constitutional right was clearly established at the time of the alleged misconduct.'" *Id.* (citing *Harmon v. City of Arlington*, 16 F.4th 1159, 1163 (5th Cir. 2021)).  A district court may consider the two elements in whichever order it chooses. *Pearson*, 555 U.S. at 236.

"Clearly established law is a 'demanding standard,' [which] protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Searles v. City of Houston*, 180 F.4th 842, 847 (5th Cir. 2026) (citations omitted).  It is settled that "[c]learly established law is not to be defined at a high level of generality." *Tucker v. City of Shreveport*, 998 F.3d 165, 174 (5th Cir. 2021).  Rather, the clearly-established "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (per curiam).  The Supreme Court has instructed that "specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine[ ] will apply to the factual situation the officer confronts." *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*)).

21

For a plaintiff to show that a right was "clearly established" at the time of the alleged conduct, he must show that the right was "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *City of Tahlequah, Okla., v. Bond*, 595 U.S. 9, 12 (2021) (cleaned up). "A right is not clearly established if existing precedent does not place the constitutional question 'beyond debate.'" *Zorn v. Linton*, 607 U.S. ---, 146 S. Ct. 926, 930, 224 L. Ed. 2d 400 (2026) (per curiam) (citation omitted) (observing that "[t]he relevant precedent must define the right with a high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.").[122]   The burden is on the plaintiff to "identify[ ] the clearly established law, and the right's contours must be 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Nevarez v. Dorris*, 135 F.4th 269, 275 (5th Cir. 2025) (citation omitted)  "Of course, 'general statements of the law are not inherently incapable of giving fair and clear warning' to officers, but 'in the light of pre-existing law the unlawfulness must be apparent[.]'" *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (cleaned up, citations omitted).  "In short, officers receive qualified immunity unless they could have 'read' the relevant precedent beforehand and 'know[ n]' that it proscribed their specific conduct." *Zorn*, 146 S. Ct. at 930 (citing *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)).

---

[122] It is settled in the Fifth Circuit that "[c]learly established law is determined by controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *See Clarkston v. White*, 943 F.3d 988, 990 (5th Cir. 2019) (citation omitted).  The Supreme Court has "assume[d] without deciding that 'controlling Circuit precedent' can clearly establish law for qualified-immunity purposes." *Zorn*, 146 S. Ct. at 930 n.3 (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021 (per curiam)).

**B. Body Camera Footage and Complaint Attachments**

At the outset the Court finds it prudent to address the scope of materials that may be considered in resolving Defendants' motion, that is, consideration of the body camera footage, the complaint itself, and the attachments to the complaint.

The Court has viewed the video evidence attached to Defendants' motion to dismiss because Plaintiff has incorporated bodycam video footage of the January 13, 2023 traffic stop, which—though not submitted by Plaintiff—is nevertheless referenced in the complaint and clearly central to Plaintiff's claims.[123]  The Court "view[s] all well-pled facts and video recordings incorporated into the pleadings in the light most favorable to the plaintiff." *Sanchez v. Nunemaker*, 179 F.4th 315, 318 (5th Cir. 2026) (citing *Harmon v. City of Arlington*, 16 F.4th 1159, 1162–63 (5th Cir. 2021)); *but see Hodge v. Engleman*, 90 F.4th 840, 844-45 (5th Cir. 2024) (treating dismissal as implicit conversion to summary judgment where district court had reviewed officer bodycam footage neither attached to nor referenced in the complaint and then granted motion to dismiss on qualified immunity grounds).  The Court discounts the complaint's allegations in favor of the video evidence only when that evidence "blatantly contradict[s]" the plaintiffs' well-pleaded factual allegations. *See Harmon*, 16 F.4th at 1163 (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *see also Winder v. Gallardo*, 118 F.4th 638, 643 (5th Cir. 2024) (observing, in reviewing

---

[123] Washington himself utilized the bodycam footage from the January traffic stop to craft the allegations in his second amended complaint and thus fairly incorporated the footage therein.  *See, e.g.,* ECF No. 96 n.21 (alleging that "all references to timing of events or quotations of conversations between [the officers] and Mr. Washington are based on the body-worn camera footage obtained from the STPSO via a Public Records Request").

23

district court's ruling on motion to dismiss, that the plaintiffs "referenced the video in their complaint and brief, . . . and caselaw supports our consideration of the video"). Here, the body camera footage largely aligns with—and thus does not "blatantly contradict"—Washington's well-pleaded factual allegations, so the Court principally relies upon Washington's pleaded allegations in its assessment.

Plaintiff challenges Defendants' reliance on facts alleged in the attachments to the complaint—in particular, police reports that Defendants themselves generated and that characterize the traffic stops in a light more favorable to Defendants than the versions set forth in Plaintiff's complaint.[124] In their reply brief, Defendants look to *Smit v. SXSW Holdings, Inc.*, 903 F.3d 522 (5th Cir. 2018) in arguing that the Court should disregard Plaintiff's characterization of the facts when inconsistent with Plaintiff's own complaint attachments. But *Smit* is taken out of context. In *Smit*, permit and traffic plans attached to the complaint expressly contradicted an allegation in the complaint. *Smit*, 903 F.3d at 528. Accordingly, it was sensible (and the court found) that the exhibit, and not the allegation, controlled. Here, though, the defendants ask the Court to rely on statements they made during internal investigations to rebut Plaintiff's allegations simply because Plaintiff attached the internal investigation paperwork to his complaint. The Court does not find this to be a sensible course of action. The Seventh Circuit case of *Northern Indiana Gun & Outdoor Shows, Inc., v. City of South Bend*, 163 F.3d 449 (7th Cir. 1998) is instructive. There, the Seventh Circuit explained that

---

[124] ECF No. 118 at 24.

24

> [t]o conclude summarily, however, that letters written by Century Center [a facility established by the defendant] represent the truth with regard to the defendants' intent simply because [plaintiff] attached them to its complaint for reasons unrelated to their truthfulness is inappropriate.

*Northern Indiana Gun & Outdoor Show*, 163 F.3d at 455. The Court continued,

instructing that

> [r]ather than accepting every word in a unilateral writing by a defendant and attached by a plaintiff to a complaint as true, it is necessary to consider why a plaintiff attached the documents, who authored the documents, and the reliability of the documents.

*Id.*

The Court heeds the Seventh Circuit's advice and considers why the plaintiff attached the documents, the authors of the documents, and the reliability of the documents. A consideration of these factors does not support the conclusion that the exhibits upon which Defendants rely to counter Plaintiff's allegations should control. In addition to bringing claims related to the actual traffic stops, Plaintiff brought claims regarding the investigations into the stops. It follows then that the investigation reports were attached to showcase the investigations, not to provide an accurate accounting of the traffic stops. Accordingly, the Court will not consider the narratives provided within the investigative reports for their truth. Instead, the Court will rely upon the well-pleaded complaint to the extent not blatantly contradicted by the body camera videos that have been submitted.

### C. Group Pleading

Not every instance in which a plaintiff categorizes defendants amounts to impermissible group pleading. *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, No.

25

15-2177, 2016 WL 4479507, at *3 (E.D. La. Aug. 25, 2016) (Morgan, J.)*, aff'd in part, re'vd in part and remanded on other grounds,* 869 F.3d 381 (5th Cir. 2017) ("A complaint that contains 'group allegations' and 'lumps together' defendants is not ipso facto in violation of Rule 8."). What matters is whether "the complaint, with its 'group allegations,' gives each defendant adequate notice" of the plaintiff's claims and grounds upon which they rest. *Id.* Thus, the Court does not dismiss Plaintiff's claims simply because he utilized categorization. Instead, where relevant, the Court considers whether the defendants were given adequate notice of Plaintiff's claims and the grounds upon which they rest.

### D. January 13, 2023 Traffic Stop

Washington alleges three Fourth Amendment violations arising out of the January 13, 2023 Traffic Stop: (1) prolonged detention, (2) unlawful search and seizure of his person and wallet, and (3) unlawful search of his vehicle. Washington alleges that he did not provide consent for any of the above actions. He further alleges that the actions were conducted because Washington is a Black man. The officers conducting the January Traffic Stop activated their body worn cameras, which videos this Court has reviewed. The Court considers each of Washington's claims—and the arguments advanced by Defendants to dismiss them—in turn.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Absent an exception, a warrantless search or seizure is "*per se* unreasonable." *United States v. Ducksworth,* 168 F.4th 764, 768

26

(5th Cir. 2026) (citation omitted).  One established exception to the warrant or probable cause requirements "is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1974).  "*Terry* stops and pat-downs, or *Terry* 'frisks' are among [other] exceptions."  *Ducksworth*, 168 F.4th at 768 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  "A '*Terry* stop' is a 'special category of Fourth Amendment 'seizures,'" in which an officer may briefly detain an individual for further investigation, if the officer has reasonable suspicion the individual is engaged in criminal activity."  *United States v. Wright*, 57 F.4th 524, 530 (5th Cir. 2023) (citing *Terry v. Ohio*, 392 U.S. at 9).

Traffic stops are "seizures" within the meaning of the Fourth Amendment.  *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  In the context of a traffic stop, *Terry v. Ohio* provides the standards under which § 1983 claims for unlawful seizure, frisk, search, and extension of detention are evaluated.  *See, e.g.*, *Pennsylvania v. Mimms*, 434 U.S. 106, 108-12 (1977) (per curiam) (applying *Terry* analysis to a traffic stop for expired license plate).  "The touchstone of [the court's] analysis under the Fourth Amendment is always 'the reasonableness in all circumstances of the particular governmental invasion of a citizen's personal security.'"  *Id.* at 108-09.

Under *Terry*, courts employ a two-part test to resolve challenges to the legality of police investigatory traffic stops.  *United States v. Cavitt*, 550 F.3d 430, 436-37 (5th Cir. 2008).  First, the court examines whether the officer's action was "justified at its inception."  *United States v. Bams*, 858 F.3d 937, 942 (5th Cir. 2017) (cleaned up); *see also United States v. Brigham*, 382 F.3d 500, 506 (5th Cir. 2004).  At inception, a

27

traffic stop is justified if a law enforcement officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation" has occurred. *Bams*, 858 F.3d at 942. If the stop was justified, the court's second inquiry is "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop . . . ." *See id.*; *see also Cavitt*, 550 F.3d at 436 ("Whether an officer's actions are 'reasonably related in scope to the circumstances that justified the stop' is a fact-specific question often informed by 'timing and sequence.'"). The "stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Bams*, 858 F.3d at 942 (cleaned up). "Reasonable suspicion" of additional criminal activity must arise "before the initial purpose of the stop ha[s] been fulfilled." *Cavitt*, 550 F.3d at 436-37 (quoting *United States v. Lopez-Moreno*, 420 F.3d 420, 431 (5th Cir. 2005)).

The second part of the *Terry* test thus makes clear that the Fourth Amendment imposes a limit on the permissible duration of a traffic stop otherwise justified at its inception. Assessing the permissible duration of a stop is keyed to the stop's mission: "[a] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015) (rejecting a rule that would render permissible a seizure posing a merely *de minimis* delay and holding that the officers' extension of the otherwise completed traffic stop was unlawful absent independent reasonable suspicion supporting the canine sniff). "Authority for the seizure . . . ends

28

when [the] tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005) (observing that a traffic stop thus "become[s] unlawful if it is prolonged beyond the time reasonably required to complete [its] mission").

Per *Rodriguez*, a traffic stop's legitimate mission involves (1) "address[ing] the traffic violation" and (2) "attend[ing] to related safety concerns." *Rodriguez*, 575 U.S. at 354. During the permissible duration of the stop, an officer is free to undertake activities both related and unrelated to the traffic stop's mission. *See id.* (observing that "the Fourth Amendment tolerate[s] certain unrelated investigations that d[o] not lengthen the roadside detention"). Once the time reasonably required to complete the stop's mission has expired, however, the Fourth Amendment prohibits an officer from "prolong[ing] the stop." *Id.* at 355.

### 1. Unlawful Extension of Detention (First Cause of Action)

Washington's first claim attacks the extended time during which he was questioned and his person, wallet, and vehicle were searched. Defendants argue that this claim should be dismissed because Washington has failed to plausibly allege that the traffic stop constituted an unlawful extension of detention.[125] They additionally invoke qualified immunity.[126]

As a threshold matter, Washington does not argue, nor could he, that the initial stop of his vehicle was improper. Upon stopping him, the officers said he was stopped for an un-signaled turn, an action that Washington does not deny. *See United States*

---

[125] ECF No. 104-1 at 32-37.
[126] *Id.*

29

*v. Causey*, 834 F.2d 1179, 1184 (5th Cir. 1987) (en banc) (holding that "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry"). Washington does not claim that the stop was unjustified at its inception.

Rather, Washington alleges that the officers impermissibly extended the stop's permissible duration. Washington provides two key timestamps at which he alleges that the purpose of the stop was achieved. First, he alleges that the purpose of the stop was achieved "within the first two minutes." He alleges that this is so because, by the two-minute mark, Cloud had informed Washington why he was being pulled over (to warn him regarding the un-signaled turn), and Washington had apologized. Second, he alleges that the purpose of the stop was achieved once the license and warrant check returned clear. This was after the two-minute mark but well before the stop concluded and Washington was permitted to continue his travels to New Orleans.

Although Washington asserts that the stop's mission was completed "within the first two minutes," the facts alleged in his well-pleaded complaint indicate that the officers had not finished running the license and warrant check at that point. The "mission" of a traffic stop is "to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (internal citations omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop." *Id.* at 355 (cleaned up). These inquiries include "checking the driver's license[ and] determining whether there are

30

outstanding warrants against the driver." *Id.* As these tasks were still underway within the first two minutes, the stop cannot be said to have concluded at that time. Instead, according to the complaint's well-pled allegations, the "mission" of the stop was complete when Lewis returned having run the license and warrant check.

Further, to the extent Washington's claim relates to allegation that the officers ordered him out of his vehicle, he fails to allege any constitutional violation. During a traffic stop lawful at its inception, an officer may order the driver to step out of the car. *See Pennsylvania v. Mimms*, 434 U.S. 106, 110 (holding that officers may "order all drivers out of their vehicles as a matter of course whenever they ha[ve] been stopped for a traffic violation"); *see also Maryland v. Wilson*, 519 U.S. 408, 414-15 (1997) (extending the rule of *Mimms* to apply to passengers as well as drivers such that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop"). No additional reasonable suspicion is required. *See Mimms*, 434 U.S. at 109 ("Deferring for a moment the legality of the 'frisk' once the bulge had been observed, we need presently deal only with the narrow question of whether the order to get out of the car, issued after the driver was lawfully detained, was reasonable and thus permissible under the Fourth Amendment. This inquiry must therefore focus not on the intrusion resulting from the request to stop the vehicle or from the later 'pat down' but on the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped."). Accordingly, it did not matter whether the officers' suspicion arising out of the "green vegetable matter" atop the weed-eater had subsided when Washington was ordered out of the

31

car.  So long as the stop's mission was reasonably underway (*i.e.,* not yet complete), ordering Washington to step out of the car was constitutionally permissible per *Mimms*' bright line rule.  Based on Washington's own complaint, he was already outside of the vehicle by the time the warrant and license check returned clear. Accordingly, based on Washington's well-pleaded facts, the stop had not yet concluded when the officers ordered him to step out of the car.  The officers did not need independent "reasonable suspicion" to order him out of the vehicle or continue the stop until the license and warrant check returned clear.

The traffic stop did not conclude once the license and warrant check came back clear, though.  Washington alleges that Lewis returned to notify Cloud and Finn that Lewis received confirmation from dispatch that he had completed checks on Washington and there were no outstanding warrants against Washington at 7:20 p.m.[127]  At this point, the "mission" of the initial stop was completed.  Washington alleges that the stop continued for some 10 additional minutes after Lewis returned having completed the license and warrant check.[128]  For this extension to be justified, the officers must have "develop[ed] reasonable suspicion of additional criminal activity."  *United States v. Andres*, 703 F.3d 828, 833 (5th Cir. 2013).  If the officers had not developed such suspicion, then they must have received valid consent for further actions *before* the purpose of the stop was completed.

---

[127] ECF No. 96 ¶ 147.  Plaintiff alleges Lewis returned at 7:19 but the body camera footage timestamp indicates he returned closer to 7:20.

[128] *Id.* ¶ 204 (alleging "[f]inally, no less than ten minutes after Mr. Washington's license had been cleared by dispatch, and thirteen minutes after Defendant Lewis had dispelled any chance of reasonable suspicion, Defendant Cloud told Mr. Washington that he was 'good to go'").

Washington alleges in his complaint that the officers had not developed reasonable suspicion of criminal activity at 7:19/7:20, and the body camera video supports the same. Washington alleges that, prior to exiting his vehicle at the officers' command, Officer Lewis realized that the item of potential interest in the backseat (the weed-eater) was not what he thought it was, thus dispelling any reasonable suspicion that item may have generated. Washington further alleges that Lewis relayed this to Cloud, who was instructing Washington out of the vehicle at that moment. And Washington alleges that Finn acknowledges that he sees the weed-eater as he was peering through the car windows. Nothing else in Washington's complaint, nor in the body camera footage, suggests reasonable suspicion.

The question then is whether, absent reasonable suspicion, the officers received valid consent for further action *before* the purpose of the stop was completed. Defendants rely on purported consent from Washington for their post-license and warrant check actions and invoke qualified immunity.

As described in greater detail below, at this stage, Washington has alleged facts that plausibly overcome the officers' invocation of qualified immunity as to his claim that the officers unlawfully searched his vehicle. *See* section II.D.2.ii. For the purposes of assessing the constitutionally tolerable duration of the stop, (a) the traffic stop was lawful at its inception and (b) the vehicle search was getting underway—Cloud and Finn were initiating the search of Washington's vehicle—when Lewis returned, having completed the license and warrant check.

33

To be sure, per *Rodriquez*, the officers were permitted to undertake activities unrelated to the traffic stop's mission during the stop's permissible duration *so long as it did not prolong the stop*. 575 U.S. at 354-55. The Fourth Amendment analysis calls for consideration of the facts and circumstances of the case to determine whether the officers' conduct, "including the length of the detention," was reasonable under those circumstances. *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc). Of course, "[c]onsensual encounters 'do not implicate Fourth Amendment concerns[.]'" *United States v. Cavitt*, 550 F.3d 430, 438-39 (5th Cir. 2008) (quoting *Brigham*, 382 F.3d at 508).

Here, Washington alleges facts indicating that completion of the vehicle search unreasonably extended the traffic stop past the license and background checks. Unless as Defendants contend the extension was attributed to what a reasonable officer would have understood to be Plaintiff's valid consent to search his vehicle, Plaintiff has stated a plausible constitutional violation. Though Defendants argue that they enjoy qualified immunity because Plaintiff fails to identify precise controlling authority in which an officer violated a traffic stop detainee's right to be free from a traffic stop prolonged by a vehicle search initiated upon the detainee's perceived consent purportedly secured during the traffic stop's mission but which vehicle search continued and was completed only after completion of the mission, the Court finds that to accept Defendants' argument would be to impermissibly impose a heightened pleading standard on Plaintiff. *See Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (citations omitted) ("Section 1983 claims implicating qualified

34

immunity are subject to the same Rule 8 pleading standard set forth in *Twombly* and *Iqbal* as all other claims; an assertion of qualified immunity in a defendant's answer or motion to dismiss does not subject the complaint to a heightened pleading standard.").

As analyzed below in Section II.D.2.ii, Plaintiff pleads facts which overcome Defendants' assertion of qualified immunity with respect to the search of his car and, it follows that Plaintiff alleges facts sufficient to plausibly show that Defendants' conduct violated his Fourth Amendment right to be free from a prolonged traffic stop in the circumstances alleged. Plaintiff alleges facts indicating that Defendants prolonged the stop beyond the stop's mission, which was to run a license and warrant check to "investigate" the failure to indicate a lane change traffic violation. Plaintiff alleges facts indicating that the stop's mission had expired—at the latest—when Lewis approached Cloud and Washington having completed the license check at 7:19-7:20 p.m. Yet Lewis "maintained possession of Mr. Washington's license while Defendant Finn began the vehicle search. Even if Mr. Washington had explicitly been told he was free to leave, he could not have left, because Defendants Cloud, Lewis, and Finn retained possession of his identification."[129]  Washington alleges that the stop was prolonged by at least 10 minutes while his car was searched *after* dispatch had cleared the license check; only then—around 7:29 p.m.—was Washington advised that he was "good to go" and his license returned to him.[130]

---

[129] ECF No. 96 ¶¶ 147-48.
[130] *Id.* ¶¶ 204-06.

He thus alleges that the comprehensive vehicle search nearly tripled the length of the stop whose mission to perform a license check to investigate failure to indicate a lane change had been completed within the first few minutes of being stopped, frisked, and questioned.  Washington has alleged facts sufficient to plausibly show that it was then clearly established that the Fourth Amendment prohibited the officers from "prolong[ing] the stop" beyond "the time needed to handle the matter for which the stop was made." *Rodriguez*, 575 U.S. at 355, 350.  Because "[a]uthority for the seizure . . . end[ed] when [the] tasks tied to the traffic infraction are—or reasonably should have been—completed[,]" *id.* at 354; *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)—here, when Lewis completed the computer check—Washington's claim regarding the unlawfully prolonged traffic stop survives Defendants' invocation of qualified immunity at this stage.[131]   Furthermore, it is difficult to square dismissing Plaintiff's cause of action for unlawful extension of detention while simultaneously maintaining the claim anchored to the underlying act which extended the detention—the vehicle search—which the Court does below in Section II.D.2.ii.[132]

Accordingly, the Court denies Defendants' motion to dismiss Washington's claim for unlawful extension of traffic stop duration.

---

[131] Plaintiff provides ample detailed allegations indicating how the circumstances alleged overcome qualified immunity.  *See generally id.* ¶¶ 305-32 (citations omitted); *see also, e.g., United States v. Jones*, 234 F.3d 234, 242–43 (5th Cir. 2000), *abrogated in part on other grounds by United States v. Pack*, 612 F.3d 341 (5th Cir. 2010) (holding that an officer impermissibly prolonged a traffic stop beyond the completion of computer checks, and observing without deciding that the officer's attempts to obtain consent while still in possession of the driver's identifying documentation and while the driver was in the back seat of the patrol unit could lead to an inference of coercion).

[132] Each of the alleged Fourth Amendment violations are inextricably intertwined.  In the interest of brevity, the Court does not repeat the patently fact-bound (or, more precisely at the pleading stage, allegation-bound) consent analysis applicable to the vehicle search—a fact-bound analysis which follows other fact-bound analyses of the frisk and wallet search—here.

### 2. Unlawful Search and Seizure

Plaintiff alleges that Defendants (1) patted him down, (2) reached into two pockets during the pat down, (3) removed his wallet from one of the pockets during the pat down, (4) searched his wallet after removing it from his person, and (5) searched his vehicle and items within it. As these are additional seizures beyond the scope of the initial traffic stop, they must be justified by additional reasonable suspicion of illegal conduct, *see United States v. Pack*, 612 F.3d 341, 351 (5th Cir. 2010), or be preceded by valid consent. *United States v. Montgomery*, 777 F.3d 269, 272-73 (5th Cir. 2015).

Here, in invoking qualified immunity, Defendants rely upon Washington's purported consent to justify the lawfulness of the frisk, the wallet search, and the vehicle search. Determining whether consent is valid is a fact-intensive endeavor. As the Supreme Court has framed the requisite voluntariness feature of consent,

> when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent.

*Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49 (1973).

To be valid, consent must be: (1) voluntary and, if consent follows an initial unconstitutional search, consent must also be (2) an independent act of free will.[133]

---

[133] As analyzed below, the "independent act of free will" feature of consent is only implicated where the purported consent follows an initial unconstitutional search. Factors relevant to that

37

*United States v. Gomez-Moreno*, 479 F.3d 350, 357 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 451 (2011); *see also Montgomery*, 777 F.3d at 273 (citation omitted). To assess voluntariness, per *Bustamonte*, courts must carefully consider the totality of the circumstances. 412 U.S. at 227. As part of that assessment, the Fifth Circuit evaluates six factors:

> 1) the voluntariness of the [detainee's] custodial status; 2) the presence of coercive police procedures; 3) the extent and level of the [detainee's] cooperation with the police; 4) the [detainee's] awareness of his right to refuse consent; 5) the [detainee's] education and intelligence; and 6) the [detainee's] belief that no incriminating evidence will be found.

*United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002). No factor is determinative.

As the Fifth Circuit has observed, "[t]here are two forms of consent: explicit and implicit." *Smith v. Lee*, 73 F.4th 376, 381 (5th Cir. 2023). Though "[i]mplicit consent 'can be inferred from silence or failure to object to a search . . . if that silence follows a request for consent[,]" such silence-based implicit consent or failure to object "must 'follow[ ] a police officer's explicit or implicit request for consent.'" *Id.* (citations omitted). "Consent may also be inferred from actions that reasonably communicate consent." *United States v. Staggers*, 961 F.3d 745, 757 (5th Cir. 2020) (citation omitted). "It is [nevertheless] well established that a [detainee's] mere acquiescence to a show of lawful authority is insufficient to establish voluntary consent." *Lee*, 73 F.4th at 381 (quoting *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996)). This

---

particular inquiry include: the "temporal proximity of the illegal conduct and the consent," whether intervening circumstances exist, and "the purpose and flagrancy" of the preceding misconduct. *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002).

is so because, critically, "[w]here there is coercion there cannot be consent." *See Bustamonte*, 412 U.S. at 234 (citation omitted) (observing that the Fourth Amendment "require[s] that a consent not be coerced, by explicit or implicit means[; f]or, no matter how subtly the coercion was applied, the resulting 'consent' would be no more than a pretext for the unjustified police intrusion against which the Fourth Amendment is directed").

### i. The "Frisk" and Wallet Search (Second Cause of Action)

To justify the frisk, the officers must have had reasonable suspicion that Washington was armed and dangerous. *Arizona v. Johnson*, 555 U.S. 323, 332 (2009). Reasonable suspicion is determined by looking to the "totality of the circumstances," *United States v. Sokolow*, 490 U.S. 1, 7-8 (1989) and must be supported by "specific and articulable facts suggesting actual physical risk to [the officers] or others." *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006). Alternatively, a frisk is justified if there is valid consent. *Montgomery*, 777 F.3d at 272-73. In support of their motion to dismiss, Defendants argue that Plaintiff consented to the frisk and wallet search.[134] Defendants further argue that Plaintiff's allegations regarding the frisk and wallet search are insufficient to bring a cause of action against Finn and Lewis.[135] As Officer Cloud was the officer that frisked Washington, searched his pockets, removed the wallet, and searched Washington's wallet, the Court first considers Cloud's conduct. The Court then turns to potential liability for officers Finn and Lewis.

---

[134] ECF No. 104-1 at 38-47.
[135] *Id.* at 38.

When Defendants sought to frisk Washington, Washington alleges that Defendants did not have reasonable suspicion that Washington was armed and dangerous. As detailed above, Washington alleges that any suspicion the weed-eater might have generated was dispelled by the time Washington had exited his vehicle. Washington was out of his vehicle before the subsequent alleged seizures occurred. Washington makes no other allegations from which the Court could conclude that Cloud and/or Lewis developed a reasonable suspicion that Washington was armed and dangerous before the pat-down. The body camera footage is aligned with Washington's allegations as to this point. Accordingly, no facts are alleged that would indicate that Defendants had reasonable suspicion to conduct the pat down search. *See Washington v. Smith*, 639 F. Supp. 3d 625, 649 (E.D. La. 2022) (*Washington I*) ("Under the clearly established law discussed[,] a reasonable officer would have known that these circumstances did not give rise to reasonable suspicion that Washington was armed and dangerous."); *see also Johnson*, 555 U.S. at 326-27 (holding "to proceed from a stop to a frisk, the police officer must reasonably suspect the person stopped is armed and dangerous").

Even absent reasonable suspicion that Washington was armed and dangerous, the frisk is permissible if Washington provided valid consent. As set forth above, to be valid, consent must be: (1) voluntary and, if consent follows an initial unconstitutional search, consent must also be (2) an independent act of free will. *United States v. Gomez-Moreno*, 479 F.3d 350, 357 (5th Cir. 2007), *overruled on other grounds by Kentucky v. King*, 563 U.S. 451 (2011); *see also United States v.*

40

*Montgomery*, 777 F.3d 269, 273 (5th Cir. 2015) (citation omitted).  Considering the totality of the circumstances, the Fifth Circuit looks to the six factors articulated above to determine whether consent is voluntary.  Mere silence, passivity, or acquiescence are insufficient to establish voluntary consent.  *See United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996); *United States v. Hernandez*, 701 F. App'x 400, 401 (5th Cir. 2017); *United States v. Cooper*, 43 F.3d 140, 145 n.2 (5th Cir. 1995) ("we disagree that nonresistance amounts to consent").

Viewing the facts alleged in the complaint in the light most favorable to Plaintiff, four factors weigh in favor of finding that his consent was not voluntary: (1) his custodial status was not voluntary; (2) he alleges that coercive police procedures were used prior to obtaining any purported consent; (3) he alleges he has limited education; and (4) he alleges that he believed he was not free to refuse the officers' requests.[136]  The two remaining factors weigh in favor of finding that Washington's consent *was* voluntary: (1) Washington was cooperative throughout the stop, including raising his hands in the air when Cloud advised him that he would like to perform a pat down search; and (2) the allegations support that Washington believed that no incriminating evidence would be found.  The complaint, supported by the body camera footage, indicates that Washington acquiesced to the search.

As Defendants have invoked qualified immunity, the salient question then is whether Washington has pointed to law that clearly established that Cloud was violating his constitutional right to be free from an unreasonable frisk. Plaintiff must

---

[136] *See, e.g.,* ECF No. 96 ¶¶ 403, 408.

41

identify caselaw indicating that it was not "beyond debate" that raising one's hands in a non-verbal sign of assent in response to an officer's indication that he would like to perform a pat-down is insufficient for voluntary consent. *See White v. Pauly*, 580 U.S. 73, 79 (2017) (explaining that the unconstitutionality of the action must be "beyond debate"). Plaintiff points to *United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996), *United States v. Hernandez*, 701 F. App'x 400, 401 (5th Cir. 2017), and *United States v. Cooper*, 43 F.3d 140, 145 n.2 (5th Cir. 1995) for support. In *Jaras*, the Fifth Circuit found that valid consent could not have reasonably been implied from "silence or failure to object" when the officer seeking to perform the search "did not expressly or impliedly ask" for the individual's consent. *Jaras*, 86 F.3d at 390. *Cooper* instructs that "nonresistance may not be equated with consent" for constitutional purposes. *Cooper*, 43 F.3d at 145 n.2. *Hernandez*, an unpublished opinion, merely cited to *Bumper v. North Carolina*, 391 U.S. 543, 548-49 (1968) for the proposition that acquiescence cannot discharge the burden of proving consent. *Hernandez*, 701 F. App'x at 401.

Similar to *Washington I*, where the complaint alleged that the officer asked Washington "whether Washington would mind if [the officer] patted him down," it was alleged that Washington made no verbal response, believed he was not free to decline, and made a "gesture of submission" to the officer. *See Washington I*, 639 F. Supp. 3d 625, 649. There, Judge Africk concluded that Washington's unlawful frisk claim survived the motion to dismiss, considering the voluntariness factors in light of the allegations. *See id.* (concluding that Washington stated a Fourth Amendment

42

violation given Washington's custodial status was not voluntary, he did not believe he could refuse the request to frisk, and the complaint alleged that Washington did not consent, and further concluding that the allegations overcame the invocation of qualified immunity).[137]  So too here.

Viewed in the light most favorable to Washington, the alleged facts, including that his custodial status was not voluntary, coercive police procedures allegedly were used prior to obtaining any purported consent, he has limited education, and he believed he was not free to refuse the officer's requests, suggest that his acquiescence perceived as consent was not voluntary.

Furthermore, where the validity of a search rests on consent, it is clearly established that the requisite consent must in fact be obtained and it must be freely and voluntarily given, that "a mere submission to a claim of lawful authority" is insufficient to implicate consent. *Florida v. Royer*, 460 U.S. 491, 497 (1983) (citations omitted). Plaintiff has alleged facts sufficient to plausibly show that Cloud's conduct violated Washington's Fourth Amendment right to be free from an unreasonable search and that constitutional right was clearly established at the time of the alleged misconduct.    Accordingly, as to the exterior search of Washington's person, Washington's allegations supporting his unlawful frisk claim overcome the officers' invocation of qualified immunity.

---

[137] Notably, Judge Africk later denied the officer's motion for summary judgment, finding a genuine issue of material fact as to whether it was objectively reasonable for the officer to believe he had Washington's consent for the frisk. *See Washington v. Smith*, No. 22-632, 2022 WL 17844622, at *3-5 (E.D. La. Dec. 22, 2022), *appeal dismissed sub nom. Washington v. Thomas*, 2023 WL 4704142 (5th Cir. 2023) (dismissing appeal for lack of jurisdiction where appellant-defendant challenged the genuineness of the factual disputes forming the basis of denial of summary judgment).

Plaintiff additionally challenges the scope of the frisk, as Washington alleges that Cloud impermissibly reached into and searched Washington's pockets. A search following an investigatory stop is typically limited to a pat-down of an individual's outer clothing and does not extend to an individual's pockets unless the officer discovers an object during the pat-down that might be a weapon. *See Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993). Furthermore, removing items from a suspect's pockets exceeds the scope of a permissible search following an investigatory stop if the officer can readily determine that the object is not a weapon. *Id.*; *see also United States v. Ponce*, 8 F.3d 989, 999 (5th Cir. 1993). If the officer suspects that an object might be a weapon, he may conduct further examination of that object. *United States v. Campbell*, 178 F.3d 345, 349 (5th Cir. 1999). These confines are clearly established; they are "beyond debate." *White*, 580 U.S. at 79.

Here, as Washington alleges and the body camera footage shows, Cloud reached into multiple of Washington's pockets while conducting the frisk. Washington further alleges that Cloud reached into both of Washington's pockets when Cloud could not have felt anything that might have been a weapon inside either pocket.[138] Indeed, one of the pockets was empty and the other contained a wallet.[139] Nothing in the body camera footage discounts this allegation. The wallet eventually seen in the footage is slim and small. Accordingly, Washington has adequately pled a Fourth Amendment violation based on the search of his pockets and removal of his

---

[138] ECF No. 96 ¶ 351.
[139] *Id.* ¶ 85.

44

wallet.[140]  Moreover, Washington has alleged facts indicating that Cloud exceeded the permissible scope of a weapons frisk as described above and as clearly established. Washington's allegations thus overcome Defendants' invocation of qualified immunity.  Accordingly, Washington has plausibly alleged a Constitutional violation based on the search of his pockets and the invocation of qualified immunity does not doom this claim at this stage.

Washington additionally challenges the search of the wallet itself.  Shortly after Cloud removed the wallet from Washington's pocket and finished the weapons frisk, Cloud asked if Washington "minded" if Cloud checked if anything "crazy" was in Washington's wallet.  The wallet, visible on the body camera footage, was not large. In response, Washington handed Cloud the wallet, which Cloud then rummaged through.  Nothing from the complaint nor the video supports a conclusion that Cloud had reasonable suspicion to search the wallet.  At issue is whether Washington's act of handing Cloud the wallet in response to Cloud's inquiry constituted valid consent.

The same principles set forth above applicable to determining voluntariness of consent apply here.  Additionally, the independent act of free will doctrine is implicated.  "[I]f an individual gives consent after being subject to an initial unconstitutional search, the consent is valid only if it was [both voluntary and an] independent act of free will, breaking the causal chain between the consent and the constitutional violation."  *United States v. Gomez-Moreno*, 479 F.3d 350, 357 (5th Cir.

---

[140] The Court notes that this finding has little bearing on the Court's analysis of the extension of detention claim as the search of his pockets, removal of his wallet, and the subsequent search of his wallet occurred before Lewis finished running the license and background check.

45

2007). To determine if consent was "the independent act of free will," courts look to factors such as the "temporal proximity of the illegal conduct and the consent," whether intervening circumstances exist, and "the purpose and flagrancy" of the preceding misconduct. *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002).

As the search of the wallet itself followed the pocket search, the heightened standard for determining voluntariness is implicated. Here, Washington has plausibly alleged that handing his wallet over was not an "independent act of free will" that "br[oke] the causal chain between the consent and the constitutional violation." *Gomez-Moreno*, 479 F.3d at 357. Almost immediately after finishing the weapons frisk, Cloud asked to "check" Washington's wallet. The temporal proximity weighs in favor of finding that the consent was not an independent act of free will. Further, nothing in the complaint or body camera footage suggests that intervening circumstances existed, which weighs towards finding that the perceived consent was not an independent act of free will. Although the pocket search may not have been "flagrant," the Court finds that handing over his wallet was not an "independent act of free will," as two of the three factors weigh toward finding that the causal connection between the earlier plausibly alleged violation and the purported consent was not broken. Accordingly, viewing the allegations in Washington's favor, any consent was invalid because it was not an independent act of free will.

Washington's allegations concerning the search of the wallet withstand Defendants' invocation of qualified immunity. Washington's purported consent "may, but does not necessarily, dissipate the taint of" the alleged Fourth Amendment

46

violation. *United States v. Montgomery*, 777 F.3d 269, 272-73 (5th Cir. 2015). Washington alleges facts indicating that his consent was not valid for an additional reason: it was not voluntary. *Id.* The same factors as above apply here: he alleges that his custodial status was not voluntary; coercive police procedures were used prior to obtaining any purported consent; he has limited education; and he believed he was not free to refuse the officer's requests.

Additionally, at the point of the wallet search, he had already been ordered out of his car, directed to the back of his car, frisked, and asked multiple questions. That the nature and extent of Washington's cooperation and his belief that nothing incriminating would be found counsel for finding voluntary consent does not defeat this claim at the pleadings stage because Washington has plausibly alleged that any consent was not voluntary and handing over his wallet was not an "independent act of free will" that "br[oke] the causal chain between the consent and the constitutional violation." *See Gomez-Moreno*, 479 F.3d at 357.

Much of the same caselaw Washington invoked regarding his lack of (or invalid) consent to the allegedly unconstitutional frisk bears on Washington's claim that the officers lacked reasonable suspicion and lacked valid consent to search his wallet. As before, no allegations plausibly indicate that the officers had reasonable suspicion to search a slim wallet for weapons. What is more, viewing the allegations in the light most favorable to Washington, he has alleged facts sufficient to plausibly show that Cloud acted unreasonably and violated his constitutional right to be free from an unconstitutional search, which right was clearly established. Again, where

47

the validity of a search rests on consent, it is clearly established that the requisite consent must in fact be obtained and it must be freely and voluntarily given—"a mere submission to a claim of lawful authority" is insufficient to implicate consent. *Royer*, 460 U.S. at 497 (citations omitted).   Simply put, unless the officers obtained Washington's valid consent, it was clearly established that the wallet search violated Washington's Fourth Amendment rights. Washington alleges facts indicating that he did not validly consent because any perceived consent was involuntary and any consent was not an independent act of free will.  Accordingly, Washington's claim that Cloud violated his clearly established right to be free from an unreasonable search of his wallet thus withstands invocation of qualified immunity at this stage.

The Court now returns to defendants Finn and Lewis.  As explained below, Plaintiff has not adequately alleged a conspiracy involving Finn and Lewis.  *See* section II.D.4.  Thus, to maintain claims against Finn and Lewis, Plaintiff must articulate specific facts to illustrate each defendant's participation.  *See Jacquez v. Procunier*, 801 F.2d 789, 793 (5th Cir. 1986).  Plaintiff has not done so.  Accordingly, the Court grants Defendants' motion to dismiss this claim as it relates to defendants Finn and Lewis.

### ii.  Search of Vehicle (Third Cause of Action)

As with the previously examined searches, the legality of the vehicular search turns on consent as Washington has plausibly alleged that the officers did not have reasonable suspicion at the point that they initiated the vehicle search.  Specifically, Washington alleges that Lewis had already realized that the weed-eater, which had

48

piqued his interest earlier, was not what he thought it was; that Lewis relayed that information to Cloud; and that Finn acknowledged that he saw the weed-eater when he was looking through the car's windows.  Nothing else in Washington's complaint, nor in the body camera footage, purports to confer reasonable suspicion.  Defendants argue that Plaintiff has failed to plausibly allege that the officers searched his vehicle without consent, and they invoke qualified immunity.[141]

As explained above, if a constitutional violation has already been committed, complexities are added to the consent inquiry.  With a preceding violation, the standard is more demanding than the general inquiry into the voluntariness of consent absent a pre-existing violation.  As the Court has determined that Washington has plausibly alleged a previous constitutional violation, the relevant inquiry is whether consent to the vehicle search was voluntary and whether there was a break in the causal chain.  *Gomez-Moreno*, 479 F.3d at 357.  The Court begins with whether Washington's consent to the search of his vehicle was voluntary.

Viewing the allegations in the light most favorable to Washington, the same four factors weigh in favor of finding voluntary consent and the same two weigh against.  As with the frisk, Washington's cooperation and his belief that no incriminating evidence would be found weigh towards finding voluntary consent, and the involuntary nature of his custodial status, alleged use of coercive police procedures to obtaining any purported consent, his limited education, and his belief

---

[141] ECF No. 1-4-1 at 47-50.

49

he was not free to refuse the officer's requests all weigh against finding voluntary consent.

Additionally, as with the frisk, the camera footage captures at best an implied request to search the car from Cloud. A review of Finn and Cloud's body camera footage reveals the following: Cloud, Washington, and Finn are located near Washington's vehicle; the officers are asking Washington questions and peering into the interior of his car; Cloud states "you don't have anything [unintelligible] in the car we should be concerned about"; Washington appears to respond to with "no, you can look" and "you want me to open the door"; Cloud informs Washington he does not need to open the door and should stay "right here"; there is more chatter; then Cloud states "we're going to" go through Washington's car; Washington makes no immediate verbal response; Finn then attempts to open one of the car's doors, at which point Washington asks if he should unlock the door; Finn tells Washington that he (Finn) would get it; questioning continues as the officers begin searching Washington's car; Lewis returns from the patrol vehicle at 7:20 and joins in questioning Washington; an officer later opens Washington's trunk and begins to look through it.

Viewing these allegations in the light most favorable to Washington, Officer Cloud made an inquiry regarding the contents of the vehicle, to which Washington responded "you can look" and even volunteered to open the door. But, as the purported consent followed a prior potential constitutional violation, the consent inquiry requires more. The complaint and body camera footage suggest that there was no break in the causal chain between the previous constitutional violation and

50

the purported consent. The inquiry regarding the vehicle happens close in time to the frisk and wallet search, and no intervening circumstances are identified or clearly shown in the body camera footage. Regardless of the "flagrancy" of the prior violations, these two factors weigh against finding a causal break. Accordingly, even assuming *arguendo* Washington's consent to search the vehicle could be deemed voluntary, he alleges facts indicating that his consent was not an independent act of free will, which would render any consent to search invalid.

Turning to the officers' invocation of qualified immunity, as outlined above, it is clearly established that, in the absence of reasonable suspicion, valid consent must precede a search. As set forth above, absent an intervening act between an illegal detention and/or constitutional violation, any consent provided is not an independent act of free will. Defendants' insistence that Plaintiff identifies no caselaw with sufficient specificity bearing on the alleged facts here does not doom Plaintiff's claim. Plaintiff points to several principles of clearly established law which he contends defeat the officers' assertion of qualified immunity at this stage of the litigation. *See, e.g., United States v. Macias*, 658 F.3d 509, 524 (5th Cir. 2011) (consent may not constitute an independent act of free will if it was given when the officer still holds driver's identification or shortly after the identification's return); *United States v. Jenson*, 462 F.3d 399, 407 (5th Cir. 2006) (when a law enforcement officer remains in possession of an detainee's identification and the detainee is not aware he may leave, any consent to search that follows closely on the heels of an illegal detention is not an independent act of free will); *United States v. Gomez-Moreno*, 479 F.3d 350, 355 (5th

51

Cir. 2007) ("if an individual gives consent after being subject to an initial unconstitutional search, the consent is valid only if it was 'an independent act of free will, breaking the causal chain between the consent and the constitutional violation'"), *overruled on other grounds by Kentucky v. King*, 563 U.S. 452, 131 S. Ct. 1849, 179 L.Ed.2d 865 (2011)). Plaintiff has satisfied his burden to allege facts sufficient to plausibly show that the officers' conduct violated his Fourth Amendment right to be free from an unreasonable vehicle search, which itself followed an initial allegedly unconstitutional search, and that right was clearly established at the time of the alleged misconduct.

Accordingly, the Court denies Defendants' motion to dismiss Washington's third cause of action that their search of his vehicle violated the Fourth Amendment.[142]

### 3. Fourteenth Amendment Claims

As to Counts One, Two and Three, Washington also brings claims against Cloud, Lewis, and Finn for discrimination under the Fourteenth Amendment.[143] Defendants argue that Washington's Fourteenth Amendment claims should be dismissed because they lack factual support.[144] Washington argues that the complaint provides evidence of racial bias by the STPSO.[145]

---

[142] Because the Court denies the motion to dismiss Washington's claim regarding the allegedly unconstitutional vehicle search, the Court need not address Washington's additional arguments that the scope of the vehicle search exceeded the scope of any consent.

[143] ECF No. 96 ¶ 306 ("Moreover, these stops and frisks were performed on the basis of racial and/or national origin profiling."), ¶ 363 ("Moreover, the Defendants Cloud, Lewis, and Finn's acts were performed on the basis of racial profiling."), ¶ 426 ("Moreover, the Defendants Cloud, Lewis, and Finn's acts were performed on the basis of racial profiling.").

[144] ECF No. 104-1 at 32-50.

[145] ECF No. 118 at 35-36.

Racial profiling can constitute a deprivation of the constitutional right to equal protection of the laws. U.S. CONST. amend. XIV; *Whren v. United States*, 517 U.S. 806, 813 (1996) (holding that claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment); *see also United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) ("[T]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.").

To establish a claim for racial profiling, the plaintiff must allege that he received treatment different from that received by other similarly situated individuals and that the unequal treatment stemmed from a discriminatory or purposeful intent. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985); *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001); *Stout v. Vincent*, 717 F. App'x 468, 471-72 (5th Cir. 2018). "[A] plaintiff's subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." *Stout*, 717 F. App'x at 472 (cleaned up). The "discriminatory intent of one official may not be imputed to another for purposes of imposing individual liability under the civil rights laws." *Id.* (quoting *Coleman v. Hous. Indep. Sch. Dist.*, 113 F.3d 528, 534 (5th Cir. 1997)).

Here, Plaintiff relies upon statistical information to allege that he received different treatment than other similarly situated individuals. Plaintiff provides no allegations from which this Court can infer racially discriminatory intent by officers

53

Cloud, Lewis, and Finn.   General evidence of STPSO racial profiling cannot be attributed to these officers without additional allegations.  *See id.* at 473 ("Moreover, we cannot attribute the general evidence of racial profiling by the MHSP . . . to [the] Officer[.]") (citing *Coleman*, 113 F.3d at 534).   Plaintiff has not made sufficient allegations of these officers operating with racially discriminatory motives.

Accordingly, Plaintiff's racial profiling Fourteenth Amendment claims within causes of action one, two, and three must be dismissed.

### 4.  Conspiracy Claim (Eleventh Cause of Action)

A conspiracy claim under § 1983 is a "legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act . . . ."  *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir. 1995), *abrogated on other grounds, Kingsley v. Hendrickson*, 576 U.S. 389, 395-97 (2015).  There must be an actual violation of § 1983 for a § 1983 conspiracy claim to be actionable.  *Id.*  To bring a § 1983 conspiracy claim, a plaintiff must allege: (1) an agreement to commit an illegal act; and (2) an actual deprivation of constitutional rights in furtherance of the conspiracy.  *Priester v. Lowndes Cty.*, 354 F.3d 414, 420 (5th Cir. 2004).  Conclusory allegations are insufficient; "[a] plaintiff must allege specific facts to show an agreement."  *Bohannan v. Doe*, 527 F. App'x 283, 300 (5th Cir. 2013); *see also Rodriguez v. Neeley*, 169 F.3d 220, 222 (5th Cir. 1999).

Defendants argue that Plaintiff has failed to plead a conspiracy claim because Plaintiff has failed to plausibly allege an underlying constitutional violation and has

54

failed to allege any facts showing an underlying agreement.[146]    Defendants

additionally invoke qualified immunity.[147]   Plaintiff argues that two factors tend to

support the existence of a conspiracy: the fact that all three officers were STPSO

deputies, evidencing a pre-existing relationship, and the way in which the officers

interacted with each other when completing the traffic stop.[148]   Washington argues

that Cloud's instructing Washington out of the vehicle after being told to by Lewis;

Lewis's questioning Washington as Cloud frisked Washington; and the officers'

questioning and distracting Washington during the vehicle search all evidence his

second point.   If such allegations were sufficient, then all police officers who worked

together during a traffic stop that resulted in a potential constitutional violation

would be said to have conspired with one another.   These allegations are insufficient

to plausibly allege that the officers had come to an agreement to violate Plaintiff's

constitutional rights.   Accordingly, the Court grants Defendants' motion to dismiss

this claim.

### E. October 8, 2023 Traffic Stop: Unlawful Seizure (Fourth Cause of Action)

Defendants contend that Plaintiff's allegations are insufficient to state a valid

claim against Searle.[149]   They additionally invoke qualified immunity.[150]   As

explained above, for a traffic stop to be justified at its inception, the officer "must have

an objectively reasonable suspicion that some sort of illegal activity, such as a traffic

---

[146] ECF No. 104-1 at 85-88.

[147] *Id.*

[148] ECF No. 118 at 56-59.

[149] ECF No. 104-1 at 50-56.

[150] *Id.*

violation, [has occurred] or is about to occur." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The "reasonableness inquiry" is key here. Reasonable suspicion, which is evaluated under the "totality of the circumstances," exists when the officer "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Id.* Reasonable suspicion need not rise to the level of probable cause, but it must be based on more than a mere hunch. *Id.*

Taking the alleged facts as true, the stop was not justified at its inception. Washington alleges that the reason Searle provided for stopping him *at the time of the stop* was that Washington did not have insurance. Washington states that he did have insurance and was pulled over by Searle because of his race. Washington has adequately pled that there was no justification for pulling him over. Accordingly, Washington has adequately stated a claim against Searle for unlawful seizure. *See Alexander v. City of Round Rock*, 854 F.3d 298, 305 (5th Cir. 2017) (finding that plaintiff had stated a claim for unlawful detention when officers stopped him and removed him from his vehicle without reasonable suspicion that a crime had or was about to occur).

That Searle reported an entirely new basis for pulling Washington over months later does not change this analysis. Nor does the potential rationale offered (reliance on a mistaken database) change the analysis.[151] Getting to the bottom of why Searle

---

[151] *United States v. Broca-Martinez*, 855 F.3d 675 (5th Cir. 2017), which Defendants rely upon for the proposition that a computer database's indication of insurance status may establish reasonable suspicion, does not change the outcome at this juncture. There, the Court concluded that "[a] state computer database indication of insurance status may establish reasonable suspicion when the officer

56

truly pulled over Washington is not an activity that is appropriate at the motion to dismiss stage. Defendants' reliance on Searle's traffic stop data is improper for this very reason. At this juncture Washington's allegations are taken as true, and, when viewed in that light, suffice.

Searle's invocation of qualified immunity does not protect him at this stage. It is clearly established that a traffic stop that lacks reasonable suspicion—as is alleged here—violates the Fourth Amendment. *Terry*, 392 U.S. at 19-20. Accordingly, the Court denies Defendants' motion to dismiss this claim.

### F. *Monell* Claims

A municipality may be subject to liability under § 1983 when that municipality maintains an unconstitutional policy or custom. *Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). To successfully state a *Monell* claim for municipal liability under § 1983, a plaintiff must show that he was deprived of a federally protected right pursuant to (1) an official policy, (2) promulgated by a policymaker, (3) that was the moving force behind the violation of a constitutional right. *Edwards v. City of Balch Springs, Tex.*, 70 F.4th 302, 307-08 (5th Cir. 2023) (citing *Peterson v. City of Fort Worth*, 588 F.3d 838, 847 (5th Cir. 2009)). These elements are necessary "to distinguish individual violations perpetrated by local government employees from those that can be fairly

---

is familiar with the database and the system itself is reliable." *Id.* at 680. While evidence of such facts may be produced by Searle in discovery in support of his defenses to Washington's complaint, such facts are absent from the complaint and thus it is impossible (and improper) to attempt to determine whether Searle ran a computer search prior to pulling Washington over; the database searched was familiar to Searle; and the system itself is reliable. Such beyond-the-pleadings factual inquiries are inappropriate at the motion to dismiss stage.

57

identified as actions of the government itself." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (cleaned up).

An official policy may be a written policy statement, ordinance, or regulation. *Esteves v. Brock*, 106 F.3d 674, 677 (5th Cir. 1997) (cleaned up).  It may also be a widespread practice that is so common and well-settled as to constitute a custom that represents municipal policy.  *Sweetin v. City of Texas City, Texas*, 48 F.4th 387, 392 (5th Cir. 2022).  Or it may be a single act conducted by an official or entity with final policymaking authority.  *Id.*  A practice constitutes a custom if it has occurred so much that "the course of conduct warrants attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice." *Peterson*, 588 F.3d at 850-51 (5th Cir. 2009).  An "extremely narrow" single incident exception to the policy or custom requirement exists and "gives rise to municipal liability only if the municipal actor is a final policymaker."  *Valle*, 613 F.3d at 542 (citing *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008)).

The "policymaker" prong is satisfied if actual or constructive knowledge of a policy is attributable to the municipality's governing body or to an official to whom the municipality has delegated policy making authority.  *Webster v. City of Houston*, 735 F.2d 838, 842 (5th Cir. 1984) (*en banc*).  Under Louisiana law, the sheriff is the final policymaker for a parish's law enforcement.  *See* LA. CONST. art. 5, § 27.  As alleged in the complaint, the sheriff in St. Tammany Parish is defendant Smith. Sheriff Smith is the policymaker for the STPSO.

To establish the third element, the plaintiff must show either that "the policy itself was unconstitutional" or that it "was adopted with deliberate indifference to the known or obvious fact that a specific constitutional violation would follow." *Edwards*, 70 F.4th at 308.

Washington brings six *Monell* claims as follows: Four claims regarding unlawful searches, each under a different theory of *Monell* liability, namely ratification, de facto policy, failure to train, and single decision by a final policymaker; one claim for racist policing under a de facto policy theory; and one claim under the First and Fourth Amendments. The Court's discussion of the first five *Monell* claims follows; the Court addresses the final *Monell* claim along with associated claim twenty-two at the conclusion of this order. Defendants argue that Plaintiff has failed to adequately allege these *Monell* claims and that they are impermissibly group pled.[152]

### 1. Unlawful Searches—Ratification Theory (Fifth Cause of Action)

The Supreme Court permits a ratification theory against a municipality in limited circumstances:

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

---

[152] ECF No. 104-1 at 17-25, 56-74.

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1998). The Fifth Circuit has cabined *Monell* claims based on ratification "to prevent the ratification theory from becoming a theory of respondeat superior." *Milam v. City of San Antonio*, 113 F. App'x 622, 626-27 (5th Cir. 2004).

*Monell* claims based on ratification do not escape the causation requirements. The Fifth Circuit has emphasized that "any violation must be causally traceable to [policymakers], not just to their subordinates." *Milam*, 113 F. App'x at 627. It then follows that demonstrating a causal relationship between an incident of police misconduct and a subsequent investigation by the municipality is highly difficult. *See id.* at 628. But, where there are "extreme factual situations," it may be proper to infer a preexisting policy or custom from a subsequent lack of discipline, reprimand, or findings of error. *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985); *see also World Wide Street Preachers Fellowship v. Town of Columbia*, 591 F.3d 747, 755 (2009). "Extreme scenarios" include "obvious violations of clearly established law," *World Wide Street Preachers Fellowship*, 591 F.3d at 755, and "collective conduct of many individuals and multiple bad acts." *Fuentes v. Nueces Cnty.*, 689 F. App'x 775, 779 (5th Cir. 2017). The "extreme factual scenario" is a high bar and "has not enjoyed wide application in [the Fifth] Circuit." *Snyder v. Trepagnier*, 142 F.3d 791, 797 (5th Cir. 1998).

Against this backdrop, Plaintiff has not presented such "extreme" allegations that the lack of admission of error following an internal investigation into the incident allows for the inference of a preexisting policy. In *Grandstaff*, one of the few Fifth

60

Circuit cases to find ratification, officers "poured" gunfire onto a truck, killing an innocent occupant. *Grandstaff*, 767 F.2d at 168. The Fifth Circuit noted that the evidence showed that six officers "participated in [a] wild barrage" and that "the exercise of the least care and the use of any rational and organized plan would have avoided" the resulting death. *Id.* at 171. The lack of reprimands, discharges, and admissions of error following the "incompetent and catastrophic performance" by the officers allowed for an inference of ratification. *Id.*

Here, Plaintiff claims that Francois and Galloway of the Internal Affairs Division "ratified" Cloud, Lewis, and Finn's conduct, turning to the Internal Investigation finding that the officers performed the stop within the parameters of the STPSO policies and regulations as support. The events of the January Traffic Stop are not so extreme, so "incompetent," so "catastrophic" that an underlying policy can be inferred from the absence of discipline or admission of error after the fact. *Compare id.* (finding ratification in a case in which police poured gunfire at a car, killing an innocent occupant) *with Snyder*, 142 F.3d at 798 (refusing to find ratification in a case in which a fleeing suspect was shot in the back).

Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's fifth cause of action for failure to state a claim.

### 2. Unlawful Searches—De Facto Policy Theory (Sixth Cause of Action)

Contrary to Defendants' opening proposition on this claim, "de facto" policies can lead to *Monell* liability in the Fifth Circuit. While an official policy can be found in a written policy statement, ordinance, or regulation, *Esteves*, 106 F.3d at 677 (5th

61

Cir. 1997), it can also be evidenced by a common and well-settled widespread practice. *Sweetin*, 48 F.4th at 392.  The latter is a "de facto" policy.  Defendants have confused precedent on policy with that of policymaking authority.  Indeed, as Defendants own chosen quote states, "[t]here is no 'de facto' policymaking authority."[153]  Defendants' leap from no de facto policymaking authority to no de facto policies is unsupported.

To bring a *Monell* claim based on a de facto policy, Plaintiff must "demonstrate that there existed [a] persistent, widespread practice of city officials or employees, which although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields v. Harris Cnty., Tex.*, 860 F.3d 803, 808 (5th Cir. 2017) (cleaned up).  Plaintiff "must also establish actual or constructive knowledge of such custom by the municipality or the official who had policymaking authority."  *Id.*

Washington alleges that the STPSO has a de facto policy of failing to obtain valid consent prior to searches, and that this policy is the "moving force" behind the violation of Washington's Fourth Amendment rights.  The policies, practices, and/or customs that Washington alleges are: (1) failing to properly screen, train, and supervise STPSO officers despite STPSO's awareness of the high risk that its officers may be engaging in unconstitutional frisks; (2) failing to adequately monitor and discipline STPSO officers, by ratifying unconstitutional conduct based on impermissible grounds; and (3) encouraging, sanctioning, and failing to rectify the STPSO custom and practice of suspicion-less frisks.[154]  He alleges that these practices

---

[153] ECF No. 104-1 at 69 (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838 (5th Cir. 2009)).
[154] ECF No. 96 ¶ 458.

are "pervasive" and that when incidents are "sufficiently common" the Court can infer a policy.

But Washington does not advance allegations that support the finding that consent-less frisks are so pervasive that the STPSO has a policy of allowing such conduct. Looking at the whole of Washington's complaint, only two incidents of allegedly consent-less frisks are provided: the January 2023 traffic stop frisk and the March 13, 2021 traffic stop frisk underlying Washington's earlier lawsuit (*Washington I*).[155] Two allegations separated by nearly two years cannot establish a pattern sufficient to infer a de facto policy.

Washington also invokes a ruling in *Washington I* for support. He argues that the policymakers must have known of the *Washington I* decision, and that the failure to act following the decision supports a finding that the STPSO has a de facto policy of not obtaining valid consent before searches. This argument is strained.

In *Washington I*, Judge Africk denied summary judgment to an STPSO officer defendant, finding that a "genuine issue of material fact" existed as to whether it was objectively reasonable to conclude that Washington had consented to the frisk. *Washington v. Smith*, No. 22-632, 2022 WL 17844622, at *3-5 (E.D. La. Dec. 22, 2022), *appeal dismissed sub nom. Washington v. Thomas*, 2023 WL 4704142 (5th Cir. 2023) (dismissing appeal for lack of jurisdiction where appellant-defendant challenged the

---

[155] Washington's instant complaint additionally contains a section on the "disparate impact of STPSO traffic enforcement on black people and people of color" but this section does not provide any additional alleged consent-less frisks. It instead provides data on the rate of traffic stops compared across racial groups. This provides no aid to the *Monell* claims regarding allegedly consent-less searches.

63

genuineness of the factual disputes forming the basis of denial of summary judgment). The court made this determination after drawing all reasonable inferences in Washington's favor, as required. *Id.* The court did not actually determine whether it was objectively reasonable for the officer to believe that he had Washington's consent to do an officer safety pat-down. *Id.*

It is hard to see how a failure to make training or policy adjustments after an unreported district court opinion that simply found that issues precluding summary judgment in favor of an STPSO officer remained, without more, supports an inference that the STPSO has a de facto policy of allowing consent-less frisks. One opinion regarding the actions of one officer does not support that there is a pervasive practice within the STPSO.

Washington has not shown that consent-less searches are "so common and well settled as to constitute a custom that fairly represents municipal policy." *Hicks-Fields*, 860 F.3d at 808. The Court dismisses Plaintiff's sixth cause of action for failure to state a claim.

### 3. Unlawful Searches—Failure to Train Theory (Seventh Cause of Action)

To state a claim that a municipality is liable for failing to train an employee, the plaintiff must allege that (1) the municipality's training practices were inadequate, (2) the municipality was deliberately indifferent in adopting this deficient practice, and (3) the inadequate training practice directly caused the violations in question. *Ratliff v. Aransas Cnty., Tex.*, 948 F.3d 281, 285 (5th Cir. 2020). "[D]eliberate indifference is a stringent standard of fault, requiring proof that

64

a municipal actor disregarded a known or obvious consequence of his action." *Bd. of County Comm'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 410 (1997). Typically, a plaintiff must show a pattern of similar violations before the lack of training constitutes deliberate indifference. *Livezey v. City of Malakoff*, 657 F. App'x 274, 278 (5th Cir. 2016). A limited, "extremely narrow" exception exists whereby a plaintiff can establish deliberate indifference without a pattern of similar violations when the plaintiff shows "that the highly predictable consequence of a failure to train would result in the specific injury suffered." *Valle*, 613 F.3d at 549. An injury is "highly predictable" where the municipality "fail[s] to train its employees concerning a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face." *Hutcheson*, 994 F.3d at 482-83.

Washington alleges that Smith, Cox, Ripoll, and Church were deliberately indifferent to the "obvious" need for training on suspicion-less and nonconsensual searches. Again, Washington invokes Judge Africk's *Washington I* decision as evidence that there was an "obvious" need for training in this area. He further alleges that the similarity between the frisk underlying his previous lawsuit, and the present one demonstrates that STPSO's inadequate training was the "moving force" behind the violation of his constitutional rights.

To adequately plead the first element, "a plaintiff must allege with specificity how a particular training program is defective." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 170 (5th Cir. 2010) (cleaned up). Plaintiff has failed to do so here. Plaintiff asserts that STPSO's training on the determination of reasonable suspicion

65

and consent was "inadequate" but provides no specificity as to how that is so. Washington notes that, per a STPSO 2023 Budget Book, the POST (Peace Officer Standards and Training Council) training was moved in-house. But he fails to provide any further specificity as to how in-house training is "inadequate." Plaintiff alleges that had STPSO issued "any" directive following Judge Africk's decision in Washington's previously brought lawsuit, the events that led to this suit "might" not have occurred. This is simply insufficient. Washington does not describe any purported deficiencies in STPSO's training program considering Cloud, Lewis, and Finn's assigned duty. *See Snyder*, 142 F.3d at 798. Necessarily, without alleging a sufficiently specified defect in a training program, Washington cannot show causation as required by the third element.

Moreover, even had Washington satisfied the first element, he has not met his burden in adequately pleading the second. Washington relies upon the March 2021 stop underlying *Washington I* and the January 2023 stop underlying this suit to show a pattern. This is insufficient. A pattern requires "sufficiently numerous prior incidents." *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir. 1989); *see also Skyy v. City of Arlington*, 712 F. App'x 396, 400 (5th Cir. 2017) ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy as required for [*Monell*] liability."). Two isolated incidents nearly two years apart cannot be said to be "numerous" so as to constitute a pattern. *See Peterson*, 588 F.3d at 850-51 (holding twenty-seven complaints of excessive force over four years was insufficient to show a custom where the plaintiff did not allege the facts

66

underlying the complaints); *see also Henderson v. Killeen Indep. Sch. Dist.*, No. A-13-CA-471-LY, 2013 WL 6628630, at *3 (W.D. Tex. Dec. 16, 2013) ("Two isolated incidents clearly do not constitute a pattern of unconstitutional conduct sufficient to hold the school district liable under § 1983.").

Plaintiff has failed to state a *Monell* claim under the failure to train theory. Accordingly, the Court dismisses Plaintiff's seventh cause of action.

### 4. Single Decision by Policymaker (Eighth Cause of Action)

"Under appropriate circumstances" a "single decision by municipal policymakers" can constitute grounds to impose *Monell* liability. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986); *see also Howell v. Town of Ball*, 827 F.3d 515, 527 (5th Cir. 2016) ("A single unconstitutional action . . . may be sufficient in rare circumstances to impose municipal liability under *Monell* . . . ."). The single-incident exception is an extremely narrow one which the Fifth Circuit has been reluctant to expand.

A review of Fifth Circuit precedent by a sister court found that "[t]he Fifth Circuit has consistently rejected nearly every attempt to use the single incident exception to demonstrate a constitutionally inadequate training program." *Carmona v. City of Brownsville*, No. 23-84, 2023 WL 10366692, at *6 (S.D. Tex. Aug. 16, 2023) (citing *Henderson v. Harris Cnty., Texas*, 51 F.4th 125, 131 (5th Cir. 2022); *Hutcheson v. Dallas Cnty., Texas*, 994 F.3d 477, 483 (5th Cir. 2021); *Anokwuru v. City of Houston*, 990 F.3d 956, 966 (5th Cir. 2021), *abrogated on other grounds by Guerra v. Castillo*, 82 F.4th 278, 278 (5th Cir. 2023); *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351,

67

367 (5th Cir. 2020); *Darden v. City of Fort Worth, Texas*, 808 Fed. App'x 246, 250 (5th Cir. 2020); *Blanchard-Daigle v. Geers*, 802 Fed. App'x 113, 117 (5th Cir. 2020); *Westfall v. Luna*, 903 F.3d 534, 553 (5th Cir. 2018); *Leal v. Wiles*, 734 Fed. App'x 905, 908 n 11 (5th Cir. 2018); *Pena v. City of Rio Grande City*, 879 F.3d 613, 624 (5th Cir. 2018); *Saenz v. City of El Paso*, 637 Fed. App'x 828, 832 (5th Cir. 2016); *Anderson v. Marshall Cnty., Miss.*, 637 F. App'x 127, 135 (5th Cir. 2016); *Hobart v. Estrada*, 582 Fed. App'x 348, 358 (5th Cir. 2014); *Kitchen v. Dallas Cnty., Tex.*, 759 F.3d 468, 485 (5th Cir. 2014), *abrogated in part by Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *Clyce v. Hunt Cnty., Tex.*, 515 F. App'x 319, 324 (5th Cir. 2013); *Valle v. City of Houston*, 613 F.3d 536, 549 (5th Cir. 2010); *Sanders-Burns v. City Of Plano*, 594 F.3d 366, 382 (5th Cir. 2010); *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 850 (5th Cir. 2009); *Thompson v. Connick*, 578 F.3d 293, 299 (5th Cir. 2009), *rev'd on other grounds*, 563 U.S. 51 (2011); *Plemons v. Amos*, 306 F. App'x 160, 164 (5th Cir. 2009); *Brumfield v. Hollins*, 551 F.3d 322, 329 (5th Cir. 2008); *Waltman v. Payne*, 535 F.3d 342, 350 (5th Cir. 2008); *Est. of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 386 (5th Cir. 2005); *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005); *Burge v. St. Tammany Par.*, 336 F.3d 363, 373 (5th Cir. 2003); *Pineda v. City of Houston*, 291 F.3d 325, 334 (5th Cir. 2002); *Cozzo v. Tangipahoa Par. Council--President Gov't*, 279 F.3d 273, 288 (5th Cir. 2002); *Hover v. Brenner*, 229 F.3d 1147, n 21 (5th Cir. 2000); *Conner v. Travis Cnty.*, 209 F.3d 794, 798 (5th Cir. 2000); *Gabriel v. City of Plano*, 202 F.3d 741, 745 (5th Cir. 2000)).  The one time the Fifth Circuit did not reject such a theory for failure to train was *Brown v. Bryan Cnty.*, 219 F.3d

68

450, 458 (5th Cir. 2000). There, the sheriff hired his young, inexperienced great-nephew as a reserve deputy, despite his great-nephew's extensive criminal history which included an active arrest warrant. *Brown*, 219 F.3d at 454. The Fifth Circuit provided the following "pertinent facts" regarding the reserve deputy:

> [He] was only twenty-one years old. He was also inexperienced . . . . He had no experience as a law enforcement officer before beginning work as a reserve deputy for the County . . . .

> Within the two-year period before his hire, [he] had been arrested for assault and battery, resisting arrest, public drunkenness, driving while intoxicated, possession of false identification, driving with a suspended license, and nine moving traffic violations. At the time he was hired, [he] was in violation of the terms of his probation; for that reason, he had an outstanding warrant for his arrest.

*Id.* at 454-55. Despite these alarming facts, the great-nephew turned reserve deputy was then "unleashed . . . on the public with no training." *Carmona*, 2023 WL 10366692, at *6. Unsurprisingly, the untrained reserve deputy then used excessive force in arresting a subject. *Brown*, 219 F.3d at 458. The Fifth Circuit found that it was "highly predictable" that not training the reserve deputy would likely result in a constitutional violation. *Id.* at 458-62.

Plaintiff does not make allegations of such egregious deficiencies. Importantly, Washington does not allege that the officers received "no training whatsoever" like the reserve deputy in *Brown*. The single incident exception is "generally reserved . . . for cases in which the policymaker provides 'no training whatsoever' with respect to the relevant constitutional duty, as opposed to training that is inadequate only as to the particular conduct that gave rise to the plaintiff's injury." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 625 n.5 (5th Cir. 2018); *see also*

69

*Hutcheson v. Dallas Cnty., Tex.*, 994 F.3d 477, 482-83 (5th Cir. 2021) ("[P]laintiffs cannot avail themselves of [the single-incident] exception because they do not allege that there was "no training whatsoever."") (citing *Pena v. City of Rio Grande City.*, 879 F.3d 613, 625 (5th Cir. 2018)).  To find that Washington's allegations suffice here would be an extension of this limited exception.  As the Fifth Circuit is averse to expansion in this area, the Court will not do so here.

Accordingly, the Court dismisses Plaintiff's eighth cause of action.

### 5.  Racist Policing Practices (Tenth Cause of Action)

Washington brings a claim against Sheriff Smith and the Supervisor Defendants for racist policing practices under the de facto policy theory of *Monell* liability.  He alleges that Smith, Cox, Ripoll, Galloway, Francois, and Church have implemented and enforced a practice of suspicion-less stops and frisks on Black people.  Washington alleges that pretextual traffic stops and weapons frisks on the basis of race is a pervasive policy in the STPSO.  Defendants argue that Washington has not plausibly alleged a pattern or practice.

The only specific instances of allegedly unlawful traffic stops that Washington provides are his three interactions with police over a more than two-year period: the March 2021 stop, the January 2023 stop, and the October 2023 stop.  While this is plainly insufficient to establish a pattern, Washington additionally relies upon statistics to bolster his allegations regarding the existence of a pattern.  Washington looks to data on the frequency of STPSO traffic stops by race.  Specifically, Washington alleges that from January 1, 2023 to November 29, 2023, there were

70

5,245 stops for every hundred thousand Black residents and only 1,619 stops for every hundred thousand White residents in St. Tammany Parish.[156]  This statistical data is sufficient to plausibly allege that a pattern or practice exists and that Smith had at least constructive notice.  *See Sowell v. City of Rowlett, Tex.,* No. 17-307, 2018 WL 4026353, at *4 (N.D. Tex. Mar. 7, 2018) (finding that plaintiff had sufficiently pled a municipal liability claim when he pointed to racial profiling reports to show a custom or practice); *see also Wright v. City of San Diego*, No. 24-2089, 2025 WL 1222507, at *7 (S.D. Cal. Aug. 28, 2025), *motion to certify appeal denied,* 2025 WL 1746305 (S.D. Cal. June 24, 2025) ("These statistical data and the City of San Diego's knowledge of racial disparities in police stops provide sufficient facts to allege the City's deliberate indifference.").

Washington must also plausibly allege that the de facto policy of racist policing was the "moving force" behind his alleged constitutional violations to maintain his *Monell* claim.  He has done so here.  Washington's complaint sufficiently alleges that the racial bias in the STPSO's policing directly led to him, a Black man, being stopped and searched for pretextual reasons.

### i.  "Supervisor Defendants"

Defendants separately argue that the *Monell* claims against Supervisor and Custodian Defendants should be dismissed as redundant.  Defendants argue that this is so because Plaintiff's claims against Sheriff Smith and the other officers in their

---

[156] ECF No. 96 ¶ 229.  Washington acknowledges that there are gaps in the data.  But this is due to the STPSO's record-keeping practices.  Regardless, the reliability of data is not an appropriate inquiry at the motion to dismiss stage.

official capacity are all truly claims against the government entity they serve (the St. Tammany Parish Sheriff's Office).  Accordingly, per Defendants, Plaintiff has achieved suing the STPSO by suing Sheriff Smith in his official capacity and the additional official capacity suits are thus duplicative.

Claims against municipal officials in their official capacity are tantamount to a suit against the municipal entity.  *See Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010) (noting that claims against the city rendered identical official-capacity claims redundant); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  The Court has discretion to dismiss official-capacity claims as redundant when they are identical to claims raised against a municipal entity.  *See Castro Romero v. Becken*, 256 F.3d 349, 355 (5th Cir. 2001); *Flores v. Cameron County*, 92 F.3d 258, 261 (5th Cir. 1996).  In this claim Washington makes no distinction between the actions of Smith and the "Supervisor Defendants."  Sheriff Smith is the policymaker for the STPSO.  It is appropriate to dismiss the claim against the "Supervisor Defendants."  The cause of action remains only as it is asserted against Sheriff Smith in his official capacity.

### ii.  Individual Capacity

Defendants argue that the *Monell* claims should be dismissed against the named defendants as brought in their individual capacities.  In response, Plaintiff states that the complaint does not allege *Monell* claims against Defendant Smith and the Supervisor Defendants in their individual capacities.

72

***

Washington has plausibly alleged a *Monell* liability claim for racist policing practices.  This claim remains only against Smith in his Official Capacity as STPSO Sheriff.

### G. Title VI of the Civil Rights Act of 1964 (Ninth Cause of Action)

Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program receiving Federal financial assistance."  42 U.S.C. § 2000d.  To enforce a claim under Title VI, plaintiffs must assert (1) *intentional* discrimination based on race or national origin and (2) that the discrimination occurred under a program or activity receiving federal financial assistance.  *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (emphasis added). The failure to allege either element dooms the claim.  If a plaintiff does not allege the existence of a discriminatory policy, he "must plausibly allege that an appropriate person . . . i.e., someone who could take corrective measures[] had *actual knowledge* of intentional discrimination yet responded with deliberate indifference."  *Bhombal v. Irving Indep. Sch. Dist.*, 809 F. App'x 233, 237 (5th Cir. 2020) (cleaned up) (emphasis added).

In support of his Title VI claim, Washington references two statements made directly to Washington by Francois.[157]  Washington additionally references statistics indicating that Black drivers are pulled over and cited more often than white drivers

---

[157] ECF No. 96 ¶¶ 490-91.

in St. Tammany Parish,[158] a 2010 "rant" by the former STPSO Sheriff, and racist emails from 2014.[159] Washington alleges that the STPSO receives federal funds. He further alleges that the STPSO has engaged in racial discrimination in its law enforcement activity. He alleges that he has suffered injuries and damages because of the alleged racially discriminatory policing.

First, Defendants argue that many of the allegations are irrelevant to Plaintiffs' Title VI claim as the underlying incidents occurred before defendant Smith became the St. Tammany Sheriff.[160] Defendants point this Court to a decision in *Washington I* for support. In *Washington I*, Judge Africk found that the plaintiff had "not adequately alleged that Smith knew about the incidents referenced in the complaint." 639 F. Supp. 3d 625, 658 (E.D. La. 2022). Here too, Plaintiff fails to adequately allege that Smith knew about the incidents referenced in his complaint. As in *Washington I*, Plaintiff's statement that "[u]pon information and belief, Defendants . . . have been made aware of concerns that STPSO employees are engaging in racial profiling but have refused to take corrective action" is insufficient.[161]

Plaintiff has not alleged the existence of a discriminatory policy. For his claim to stand he therefore must have plausibly alleged that "someone who could take corrective measures[] had *actual knowledge* of intentional discrimination yet responded with deliberate indifference." *Bhombal,* 809 F. App'x at 237 (cleaned up)

---

[158] *Id.* ¶¶ 15-16, 229-32.
[159] *Id.* ¶ 12.
[160] ECF No. 104-1 at 75-76.
[161] ECF No. 96 ¶ 493.

74

(emphasis added).  He has not done so here.  Accordingly, the Court dismisses his Title VI claim.

### H. State Law Claims

#### 1.  Unlawful Search and Seizure (Twelfth Cause of Action)

Article I, Section 5 of the Louisiana Constitution provides that "[e]very person shall be secure in his person, property, . . . against unreasonable searches, seizures, or invasions of privacy." LA. CONST. art. 1, § 5.  The principles embodied in the Fourth Amendment of the United States Constitution are analogous to the principles in Article I, Section 5.  *See Washington v. Smith*, 639 F. Supp. 3d 625, 646 (E.D. La. 2022) (Africk, J.) (quoting *May v. Strain*, 55 F. Supp. 3d 885, 901 (E.D. La. 2014) (Brown, J.)); *see also Imani v. City of Baton Rouge*, 614 F. Supp. 3d 306, 376 (M.D. La. 2022).  "Louisiana applies qualified immunity principles to state constitutional law claims based on the same factors that compelled the United States Supreme Court to recognize a qualified good faith immunity for state officials under § 1983." *Washington*, 639 F. Supp. 3d at 646 (cleaned up).

Washington's twelfth cause of action is based on the alleged extension of the traffic stop beyond the period required to complete its legal purposes, and the alleged searches and seizures during that stop.  Washington's parallel claims as brought under the federal constitution have survived Defendants' challenge at this stage of the proceedings.  For the reasons given in this Court's denial of Defendants motion to dismiss these parallel federal claims, the Court declines to dismiss this state constitutional claim.  *See Smallwood ex. rel. T.M. v. New Orleans City*, No. 15-1887,

2015 WL 5944374, at *7 (E.D. La. Oct. 13, 2015) (Barbier, J.) ("Inasmuch as Plaintiff's claims under state constitutional law parallel entirely the section 1983 allegations, Plaintiff fails to state a claim against [defendant] sufficient to overcome qualified immunity."); *see also Washington*, 639 F. Supp. 3d at 646 (dismissing claims for same reasons); *May*, 55 F. Supp. 3d at 901 (same). The Court denies Defendants' motion to dismiss Washington's twelfth cause of action.

### 2. Invasion of Privacy (Thirteenth Cause of Action)

The "test of whether and when an intrusion on privacy rights occurs as a matter of the Louisiana Constitution is identical to the Fourth Amendment standard." *State v. Moultrie*, 224 So. 3d 349, 352 (La. 2017).

Washington's thirteenth cause of action is based on the search of his person, wallet, and vehicle. Washington's second and third causes of action allege federal constitutional violations based on the very same allegations. Accordingly, this claim survives to the same extent that the analogous federal law claims remain.

### 3. Negligent Infliction of Emotional Distress (Fourteenth-Sixteenth Causes of Action)

Louisiana law does not generally recognize an independent cause of action for negligent infliction of emotional distress. *Moresi v. Dep't of Wildlife*, 567 So. 2d 1081 (La. 1990). The cause of action is only available under limited circumstances. "For example, negligent infliction of emotional distress has been awarded when a plaintiff watches their property get damaged [ ] or when a plaintiff experiences 'fright or nervous shock' to the degree that they are 'in great fear for [their] personal safety." *See Harris-Gilchrease v. Cap. One Auto Fin.*, No. 24-357, 2024 WL 5046006, at *6

(E.D. La. Dec. 9, 2024) (citations omitted).  A plaintiff asserting negligent infliction of emotional distress must prove the elements of negligence, namely:

> (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages.

*Simmons v. State*, 255 So. 3d 701, 704-05 (La. App. 4 Cir. 2018), *writ denied*, 259 So. 3d 345 (La. 2018) (quoting *Crockett v. Cardona*, 713 So. 2d 802, 804 (La. App. 4 Cir. 1998).

When a plaintiff brings a negligent infliction of emotional distress claim absent physical damage/injury, the plaintiff must prove "the especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." *Spencer v. Valero Ref. Meraux, L.L.C.*, 356 So. 3d 936, 950 (La. 2023) (cleaned up).  For such a claim to be proper, "[t]he plaintiff's mental disturbance must be 'serious.'" *Id.*  Emotional distress is considered "serious" if "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Held v. Aubert*, 845 So. 2d 625, 633-34 (La. App. 1 Cir. 2003).

Washington's negligent infliction of emotional distress claims related to the January and October Traffic Stops and the Investigation of the October Traffic Stop all fail for the same reason: Washington has not alleged any facts that indicate that his emotional distress is "serious."  Washington has pled that he suffers from depression, high blood pressure, insomnia, headaches, nausea, and anxiety.  In the

77

context of non-confrontational traffic stops, this is insufficient. *See Danks v. Grayson*, 626 F. Supp. 3d 922, 945 (E.D. La. 2022) (finding traffic-stop passenger-arrestee's allegations of serious emotional trauma and humiliation from being aggressively pulled from the car, handcuffed, and left lying on the ground with her pants down and body exposed insufficient). Negligent infliction of emotional distress is not a broadly available claim, and this is not such an exceptional case such that the theory is available here.

Accordingly, the Court dismisses causes of action fourteen, fifteen, and sixteen.

### 4. Negligent Supervision/Training (Seventeenth Cause of Action)

Defendants argue that Plaintiff has failed to state a negligent supervision/training claim against Boehm (Sheriff Smith's "second in command"), Galloway (Captain of the STPSO Public Integrity Bureau and Internal Affairs Division), Francois (investigator for the STPSO Internal Affairs Division), and Parker (STPSO Internal Affairs Supervisor).[162] Outside of raising qualified immunity in the section subtitle, Defendants make no arguments regarding the other listed defendants (Sheriff Smith, Cox (Deputy Chief appointed to STPSO's Investigations & Professional Standards Division), Ripoll (STPSO Investigations Major), and Church (STPSO Training Division Captain)). Plaintiff argues that Defendants have implicitly conceded that the claim stands as to Smith, Cox, Ripoll, and Church, and that the claim also stands against the other defendants because Washington has alleged that each "Supervisor Defendant" held a relevant supervisory and

---

[162] ECF No. 104-1 at 98.

investigatory role at the STPSO and that STPSO's supervision and training was "flagrantly lacking."[163]

The Court first addresses qualified immunity. While true that Louisiana applies qualified immunity to state constitutional law claims, Louisiana does not apply qualified immunity to state tort law claims. *See Roberts v. City of Shreveport*, 397 F.3d 287, 296 (5th Cir. 2005). Negligence sounds in tort, not constitutional law. Federal qualified immunity does not provide a shield. However, "public entities in Louisiana are shielded for negligent conduct in the 'exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.'" *Perry v. City of Bossier*, No. 17-583, 2018 WL 5074674, at *13 (W.D. La. Oct. 17, 2018) (quoting La. Stat. Ann. § 9:2798.1(B) (2009)). This statutory immunity does not cover actions that are "criminal, fraudulent, malicious, intentional, willful, outrageous, reckless, or flagrant misconduct." La. Stat. Ann. § 9:2798.1(C). The Sheriff's "training and supervision decisions are policymaking acts under the immunity statute." *Perry*, 2018 WL 5074674, at *13 (citing *Roberts*, 397 F.3d at 296).

Defendants make no arguments regarding the statutory immunity afforded under Louisiana law. Indeed, as stated above, the only mention of immunity relating to this cause of action is in the subsection header. The Court finds this insufficient to argue that Defendants are entitled to statutory immunity under Louisiana law.

---

[163] ECF No. 118 at 66.

The Court turns to Defendants' argument that Plaintiff's allegations are insufficient as to defendants Boehm, Galloway, Francois, and Parker as Plaintiff alleges no facts specific to those defendants. "The elements of liability in a Louisiana negligence case are: (1) duty; (2) breach of duty; (3) cause-in-fact; (4) scope of liability or scope of protection; and (5) damages." *Gomez v. Galman*, 18 F.4th 769, 780 (5th Cir. 2021) (citing *Kelley v. Dyson*, 10 So. 3d 283, 287 (La. App. 5 Cir. 2009)). Defendants make no arguments regarding these elements for defendants Smith, Cox, Ripoll, or Church.[164] The Court construes Defendants' argument as to the other defendants as challenging duty and breach. The dearth of allegations against Boehm, Galloway, Francois, and Parker relating to supervision requires the dismissal of this claim against them. Generally alleging that they hold supervisory roles in the STPSO but making no specific mention of them with regards to this claim is insufficient to plausibly allege duty and breach.

The Court must therefore dismiss claim seventeen as brought against defendants Galloway, Francois, and Parker. As Defendants make no specific arguments on the insufficiency of the pleading as to Smith, Cox, Ripoll, and Church, the claim remains as brought against that defendant group.

---

[164] The Court notes that Defendants, in reply, assert that the Court should dismiss this cause of action if it dismisses Plaintiff's *Monell* claim for failure to train/supervise. The Court does not consider arguments first raised in reply. Moreover, "a claim for negligent training under state law is completely different from the failure-to-train theory of *Monell* liability . . . ." *A.F. by and through J.F. v. St. Tammany Parish School Board*, No. 23-7426, 2025 WL 1220805, at *15 (E.D. La. Apr. 28, 2025) (Fallon, J.).

80

### 5. Failure to Intervene (Eighteenth Cause of Action)

Defendants argue that Washington has failed to allege a claim for failure to intervene against defendant Cloud.[165]  Defendants provide no specific argument that this claim is insufficient as it relates to defendants Lewis and Finn.[166]  Defendants section header states "[t]he eighteenth cause of action must be dismissed for failure to state a claim, and alternatively, because [d]efendants are entitled to qualified immunity."[167]  Federal qualified immunity has no bearing on this state law claim as it sounds in tort.  *Tuttle v. Sepolio*, 68 F.4th 969, 976 (5th Cir. 2023); *see also Roberts*, 397 F.3d at 296.

Plaintiff alleges that he brings the failure to intervene claim based on the "duty to intervene" that Louisiana recognizes, which he alleges includes the duty for officers to intervene to protect citizens from the conduct of other officers.[168]

The complaint makes no specific allegations that Cloud failed to intervene. Plaintiff argues that because he alleges that all the officers, not just Cloud, engaged in unlawful conduct, and that because Cloud was present the entire time, he had a duty to intervene.  This is insufficient.  Plaintiff's failure to make specific allegations as to how Cloud breached his duty to intervene renders his claim against Cloud

---

[165] ECF No. 104-1 at 98.

[166] *Id.*

[167] *Id.*

[168] ECF No. 96 ¶ 575-80. (citing *Westmoreland v. City of Natchitoches*, 771 So. 2d 715, 717 (La. App. 3 Cir. 2000); *Keys v. Broussard*, 692 So. 2d 596, 598 (La. App. 3 Cir. 1997); La Stat. Ann. § 40:2401; La. Stat. Ann. § 40:24024; *Rogers v. Dep't of Public Safety & Corrections*, 2022 WL 669397 (La. App. 1 Cir. 2022), *reh'g denied* (Apr. 12, 2022); and *Taylor v. City of Baton Rouge*, 233 So. 2d 325 (La. App. 1 Cir. 1970), *writ refused*, 236 So. 2d 32 (La. 1970)).

deficient. Accordingly, cause of action eighteen as it is brought against defendant Cloud is dismissed. The claim remains pending against defendants Finn and Lewis.

### 6. False Imprisonment (Nineteenth Cause of Action)

Under Louisiana law, "[t]he tort of false imprisonment consists of the following two essential elements: (1) detention of the person; and (2) the unlawfulness of the detention." *Miller v. Desoto Reg'l Health Sys.*, 128 So. 3d 649, 658 (La. App. 3 Cir. 2013) (cleaned up). Unlawful detention is restraint without color of legal authority. *Kyle v. City of New Orleans*, 353 So. 2d 969, 971 (La. 1977). In Louisiana, the federal reasonable suspicion standard is applied to traffic stops. *State v. Hunt*, 25 So. 3d 746, 753 (La. 2009) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *State v. Kalie*, 699 So. 2d 879, 881 (La. 1997)); *see also* La. Code Crim. Proc. Art. 215.1 ("A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense . . ." and "During detention of an alleged violator of any provision of the motor vehicle laws of this state, an officer may not detain a motorist for a period of time longer than reasonably necessary to complete the investigation of the violation and issuance of a citation for the violation, absent reasonable suspicion of additional criminal activity . . . .").

Defendants argue that Plaintiff's claim for false imprisonment during the January Traffic Stop should be dismissed for three reasons: (1) because the allegations are based on "group pleading"; (2) because Plaintiff has failed to allege specific conduct on behalf of each individual defendant; and (3) because Defendants

82

are entitled to qualified immunity.[169]  Plaintiff argues that the complaint provides extensive allegations regarding the actions of the defendants throughout the complaint; that he has plausibly alleged that he was (1) detained for the duration of the stop and (2) the officers did not have reasonable suspicion nor probable cause to detain him for the prolonged period; and that qualified immunity does not apply to this state law claim.[170]

Defendants' "group pleading" argument is unpersuasive.  Washington's nineteenth cause of action clearly states that it is brought against defendants Cloud, Lewis, and Finn.[171]  These are the three officers who were present during the January Traffic Stop.  That Washington then calls them "Officer Defendants" does not render Defendants any less capable of understanding Washington's claim.  Moreover, the complaint itself provides extensive allegations as to the action of each individual officer during the traffic stop.  That Plaintiff did not repeat the full set of allegations within each cause of action is of no import.

Plaintiff has adequately alleged that defendants Cloud, Lewis, and Finn, the "Officer Defendants" in this claim, detained him during the January Traffic Stop.  He has further adequately alleged that those same defendants did not have reasonable suspicion to continue the traffic stop after the license and warrant check returned and that he did not consent to the extension of detention past that time.  The Court cannot say that Plaintiff has failed to adequately allege an unlawful detention.  *Cf.*

---

[169] ECF No. 104-1 at 98-99, 27-28.
[170] ECF No. 118 at 68-69.
[171] See ECF No. 96 at 115.

*Perry*, 2018 WL 5074674, at \*14-16 (denying summary judgment on plaintiff's state false imprisonment claim despite finding that the officer was protected by federal qualified immunity from § 1983 false arrest claim).

Accordingly, the Court denies Defendants' motion to dismiss this claim.

### 7.  Vicarious Liability (Twentieth Cause of Action)

Plaintiff's complaint does not clarify for which alleged torts he seeks to hold Smith and the "Supervisor Defendants" vicariously liable.  The Court will assume that he aims to hold Smith and "Supervisor Defendants" vicariously liable for failure to intervene as alleged in count eighteen and false imprisonment as alleged in count nineteen, the two intentional torts alleged.  Vicarious liability is not available for Plaintiff's § 1983 claims.  *See, e.g., Estate of Davis ex rel. McCully v. City of N. Richland Hills*, 406 F.3d 375, 380-81 (5th Cir. 2005).  And this Court has dismissed Plaintiff's three negligent infliction of emotional distress claims.  *See* section II.H.3.

Defendants argue that Plaintiff's claim is insufficient because he has engaged in group pleading.[172]  Defendants also argue that plaintiff has failed to state a claim against Boehm, Cox, Galloway, Francois, Parker, and Church because plaintiff does not make any specific allegations as to these defendants.[173]  They further argue that claims against these defendants are redundant and duplicative because Plaintiff is already asserting a vicarious liability claim against Smith.[174]  Plaintiff, in response, argues that the complaint satisfies the elements of vicarious liability for all

---

[172] ECF No. 118 at 69-70.
[173] *Id.* at 101.
[174] *Id.*

Supervisor Defendants as he alleges that Boehm, Cox, Galloway, Francois, Parker, and Church hold supervisory roles and that they were acting within the scope of their employment when subordinate officers violated the law.[175]

Plaintiff has stated a claim against Smith but not the other "Supervisor Defendants." Plaintiff has alleged that Smith "heads" the STPSO and that all STPSO officers act under his "direction, control, and supervision." Defendants do not appear to contest these allegations. Plaintiff makes no similar allegations as to the "Supervisor Defendants." His listing of their roles at the STPSO in preceding paragraphs of the complaint is insufficient. Outside of Smith, no specific defendant is named within the twentieth cause of action. Plaintiff's allegation that "Supervisor Defendants are liable under the laws of vicarious liability" is conclusory and therefore implausible.

The Court grants Defendants' motion to dismiss as to the "Supervisor Defendants"; cause of action twenty remains as alleged against Smith.

## I. Public Records Claims

### 1. *Monell* Liability under the First and Fourth Amendments (Twenty-First Cause of Action)

Defendants argue that Plaintiff has improperly engaged in group pleading.[176] They further argue that Plaintiff's allegations against the "Custodian Defendants" are insufficient as to Buckner, Sevante, and Boehm and additionally redundant and duplicative as Plaintiff is already asserting this claim against Smith.[177] Plaintiff

---

[175] ECF No. 118 at 69-70.
[176] ECF No. 104-1 at 29-30.
[177] *Id.* at 102-04.

argues that he has not engaged in improper group pleading, he need not specifically single out a policymaker, and his description of the relevant roles of each defendant in the STPSO is sufficient.[178]

The Court notes that in reply Defendants attempt to argue that Plaintiff has failed to make allegations sufficient to sustain a *Monell* claim.  The Court will not entertain arguments first brought in a reply.  *See, e.g., Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010); *Little Tchefuncte River Association v. Artesian Utility Co., Inc.*, 155 F. Supp. 3d 637, 657 (E.D. La. 2015) ("Arguments cannot be raised for the first time in a reply brief.") (quoting *Benefit Recovery, Inc. v. Donelon*, 521 F.3d 326, 329 (5th Cir. 2008)).

As previously explained, an official capacity *Monell* suit is tantamount to a suit against the municipal entity.  *See Sanders-Burns*, 594 F.3d at 373; *see also Graham*, 473 U.S. at 165-66.  The Court has discretion to dismiss official-capacity claims as redundant when they are identical to claims raised against a municipal entity. *See Castro Romero*, 256 F.3d at 355; *Flores*, 92 F.3d at 261.  The overlapping claims are redundant; accordingly, the Court exercises its discretion and dismisses the official capacity claims against Boehm, Mancuso, Buckner, Sevante, and STPSO Custodian John Doe(s).  The Court does not dismiss the official capacity claim as brought against Smith.

As to Plaintiff's claim against these defendants in their individual capacities, *Monell* analysis does not apply.  When a plaintiff sues "governmental officials in their

---

[178] ECF No. 118 at 70-72.

individual capacities . . . [he] must allege specific conduct giving rise to a constitutional violation." *Oliver v. Scott*, 276 F.3d 736, 741 (5th Cir. 2002) (citing *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999)). To do so "plaintiff must allege specific facts giving rise to a constitutional violation." *Id.* (citing *Baker v. Putnal*, 75 F.3d 190, 194 (5th Cir. 1996)). Defendants' argument regarding the lack of specific conduct pled rests upon the lack of utilization of specific defendants' names within the paragraphs encompassing this cause of action. Plaintiff has alleged specific facts giving rise to a constitutional violation, but he has not connected them to specific individuals. That each defendant has a role within the STPSO is of no moment. However, as explained in greater detail in section II.I.2, within the complaint, Plaintiff alleges personal involvement on behalf of Mancuso, Buckner, and, to a lesser-extent, Sevante. Plaintiff has failed to allege personal involvement to connect the other "Custodian Defendants" to the constitutional violation. Accordingly, to the extent that Plaintiff did intend to bring this claim against Smith and the "Custodian Defendants" in their individual capacities, it is dismissed as to all defendants except for Mancuso, Buckner, and Sevante.

## 2. Public Records Request (Twenty-Second Cause of Action)

Washington brings his twenty-second cause of action under the Public Records Act of Louisiana. The law provides that "any person of the age of majority may inspect, copy, or reproduce any public record" except as otherwise provided by law. La. R.S. 44:31(B)(1). It further provides that

> Any person who has been denied the right to inspect, copy, reproduce, or obtain a copy or reproduction of a record under the provisions of this

87

> Chapter, either by a determination of the custodian or by the passage of five days, exclusive of Saturdays, Sundays, and legal public holidays, from the date of his in-person, written, or electronic request without receiving a determination in writing by the custodian or an estimate of the time reasonably necessary for collection, segregation, redaction, examination, or review of a records request, may institute proceedings for the issuance of a writ of mandamus, injunctive or declaratory relief . . .

La. R.S. 44:35(A).

Defendants argue that Plaintiff's allegations are insufficient as brought against Mancuso, Buckner, Sevante, and Boehm as they are based on group pleading and Plaintiff has not provided any allegations of personal involvement or specific conduct on behalf of these defendants.[179]  They further argue that the claim should be dismissed as duplicative or redundant as Plaintiff is already asserting this claim against Smith.[180]

Defendants' argument regarding Mancuso and Buckner do not persuade.  The danger of group pleading, that Defendants lack adequate notice of Plaintiff's claims such that they can respond, is not at issue here.  Plaintiff has not lumped every defendant in this action together.  He has simply crafted a category of relevant defendants, whose relevance is alleged through their roles listed and the background allegations.  Plaintiff has made a logical categorization based upon the substance of his allegations; it is sensible that he would bring a failure to respond to public records request claim against those at the STPSO who have the authorization to respond to public records requests.  Mancuso and Buckner are both mentioned multiple times in

---

[179] ECF No. 104-1 at 30-32, 104-06.
[180] *Id.*

the complaint and attachments thereto. Their relevance to this claim is clear. While more tenuous, Sevante's relevance can also be gleaned from the complaint. As Defendants note, Sevante is specifically mentioned in Plaintiff's discussion of the alleged "wild goose chase" the STPSO initiated in response to Washington's records requests. Defendants' argument regarding Boehm, however, is well-taken as there are no specific allegations in the complaint, nor material in the attachments that specifically ties him to these allegations. Defendants notably do not attack the substance of Plaintiff's twenty-second cause of action.

The Court denies Defendants' motion to dismiss Plaintiff's twenty-second cause of action except as to defendant Boehm.

### J. Remedies

Defendants additionally bring challenges to Plaintiff's request for punitive damages, pre-judgment interest, and injunctive relief.[181]

### 1. Punitive Damages

Section 1983 does not allow for recovery of punitive damages against a municipal entity, *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981), but punitive damages are available from individual defendants. *Smith v. Wade*, 461 U.S. 30 (1983). Under § 1983, punitive damages may be awarded only if the official conduct "is motivated by evil motive or intent" or demonstrates "reckless or callous indifference" to a person's constitutional rights. *Id.* Plaintiff has alleged that the

---

[181] ECF No. 104-1 at 109-114.

89

individual officers acted with callous indifference. And Plaintiff has individual capacity § 1983 claims remaining: cause of action four and part of cause of action two.

Louisiana has a general public policy against punitive damages. *Ross v. Conoco, Inc.*, 828 So. 2d 546, 555 (La. 2002). Under Louisiana law, punitive damages are not recoverable absent an express statutory authorization. *International Harvester Credit Corp. v. Seale*, 518 So. 2d 1039, 1041 (La. 1988). Plaintiff has not identified a statutory provision entitling him to punitive damages for his state constitution claim.

Accordingly, the motion to dismiss Plaintiff's claims for punitive damages is granted as to Plaintiff's claim under the Louisiana Constitution and denied as to Plaintiff's § 1983 claims to the extent they are brought against Defendants in their individual capacities.

### 2. Pre-judgment interest

Defendants provide no authority to support deciding on pre-judgment interest at the 12(b)(6) stage. That the decision whether to grant pre-judgment interest in § 1983 cases is discretionary is of no moment. The Court need not determine how it will exercise that discretion at this junction. Accordingly, the Court denies Defendants' motion to dismiss as to Plaintiff's prayer for pre-judgment interest.

### 3. Additional Requests for Relief

"[I]njunctions requiring affirmative steps to safeguard constitutional rights fall squarely within the equitable powers of the federal courts." *Daves v. Dallas Cnty., Texas*, 22 F.4th 522, 565 (5th Cir. 2022) (Haynes, J., dissenting) (citing *M. D. by*

*Stukenberg v. Abbott*, 907 F.3d 237, 276–79, 282–83 (5th Cir. 2018) (concluding that a federal court could require a state foster care system to implement training, investigative, reporting, and computer systems policies); *Ruiz v. Estelle*, 679 F.2d 1115, 1155–56 (5th Cir. 1982) (concluding that a federal court could require a state prison system to record all disciplinary hearings, preserve those recordings, and make them available to inmates), *modified on other grounds*, 688 F.2d 266 (5th Cir. 1982); *Ciudadanos Unidos de San Juan v. Hidalgo Cnty. Grand Jury Comm'rs*, 622 F.2d 807, 828–30 (5th Cir. 1980) (concluding that a federal court could require local jury commissioners to formulate policies to ensure that indigent individuals, among other groups, were adequately represented in grand jury pool); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15–20 (1971) (requiring a state public school district to implement a busing policy to rectify an equal protection violation and noting that a federal court's power to enter such injunctive relief "does not differ fundamentally from other cases involving the framing of equitable remedies to repair the denial of a constitutional right"); *Jones v. Tex. Dep't of Crim. Just.*, 880 F.3d 756, 759–60 (5th Cir. 2018) (per curiam) (concluding that a federal court could require a prison to provide an inmate with less sugary meals); *Gates v. Cook*, 376 F.3d 323, 339–40 (5th Cir. 2004) (concluding that a federal court could require a prison to adopt a policy providing fans, ice water, and daily showers to inmates under certain conditions); *Miller v. Carson*, 563 F.2d 741, 751 (5th Cir. 1977) (concluding that a federal court could require a prison to adopt a policy allowing inmates to exercise outdoors)).   The Court sees no reason to strike relief requests at this juncture.

91

Accordingly, Defendants' motion to dismiss Plaintiff's prayer for injunctive relief is denied.

## III.   CONCLUSION

**IT IS ORDERED** that Defendants' motion[182] to dismiss pursuant to Rule 12(b)(6) is **GRANTED IN PART AND DENIED IN PART**.

The motion is **GRANTED** as to Plaintiff's fifth, sixth, seventh, eighth, ninth, eleventh, fourteenth, fifteenth, and sixteenth claims.  It is **GRANTED IN PART** as described above as to Plaintiff's racial profiling Fourteenth Amendment claims within causes of action one, two, and three; as well as described above with respect to the tenth, seventeenth, eighteenth, twentieth, twenty-first, and twenty-second claims; as well as described above with respect to punitive damages.  The motion is otherwise **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion[183] for ruling is **DENIED AS MOOT**.

New Orleans, Louisiana, this 6th day of August, 2026.

_____
BRANDON S. LONG
UNITED STATES DISTRICT JUDGE

---

[182] ECF No. 104.
[183] ECF No. 146.

92